# UNITED STATES COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE:<br><br>CENTER FOR ALTERNATIVE MEDICINE, PLLC<br><br>                        Debtor. | Case No. 23-12482-JGR<br><br><br>Chapter 11<br>(Subchapter V) |

## THIRD AMENDED PLAN OF REORGANIZATION FOR SMALL BUSINESS UNDER SUBCHAPTER V OF CHAPTER 11 DATED FEBRUARY 20, 2024

CENTER FOR ALTERNATIVE MEDICINE, PLLC, as Debtor-in-Possession[1] herein, hereby respectfully submits to the United States Bankruptcy Court for the District of Colorado this Third Amended Plan of Reorganization for Small Business Under Subchapter V of Chapter 11 Dated February 20, 2024, and in support thereof, proposes as follows:

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | DEFINED TERMS AND RULES OF CONSTRUCTION | 2 |
| III. | DISCLOSURES UNDER SUBCHAPTER V OF CHAPTER 11 | 13 |
| IV. | SUMMARY AND OVERVIEW OF PLAN | 25 |
| V. | TREATMENT OF UNCLASSIFIED CLAIMS | 26 |
| VI. | TREATMENT OF CLASSES OF CLAIMS AND INTERESTS | 26 |
| VII. | ALLOWANCE AND DISALLOWANCE OF CLAIMS | 30 |
| VIII. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 31 |
| IX. | MEANS FOR IMPLEMENTATION OF PLAN | 33 |
| X. | EFFECT OF CONFIRMATION | 36 |
| XI. | RIGHTS AND REMEDIES UPON DEFAULT | 39 |
| XII. | RIGHTS PRECEDING AND SUBJECT TO CONSUMMATION | 40 |
| XIII. | MISCELLANEOUS PROVISIONS | 42 |
| XIV. | CONFIRMATION REQUEST | 43 |

---

[1] Capitalized terms within this Plan and the exhibits attached hereto shall have the meaning ascribed to such terms within Section 2.1 *infra*.

# I.  INTRODUCTION

This document constitutes the Plan of Reorganization under Subchapter V of Chapter 11 of the Code for Center for Alternative Medicine, PLLC.

**1.1.  Purpose of the Plan.** The Plan is the means for the Debtor to effectively reorganize under Chapter 11 of the Code, which constitutes a new contractual relationship – upon confirmation – between the Debtor and all Claimants, Interest Holders, and Persons and Entities with notice of the Case prior to the Confirmation Date. Pursuant to 11 U.S.C. §§ 1190 and 1191, the Debtor hereby provides sufficient information for Claimants and interested parties to make an informed judgment as to whether to accept or reject the Plan including, but not limited to, reciting Pre-Petition and Post-Petition material events, operations, and financial affairs; explaining the formulas applied to the Liquidation Analysis and Disposable Income Projections; and describing the Treatment of all Claims and Interests classified under one (1) Priority Class, eleven (11) Secured Classes, 1 Unsecured Class, and 1 Class of Interest Holders.

**1.2.  Disclaimer. YOUR RIGHTS MAY BE AFFECTED. Therefore, you should carefully consider and discuss all information disclosed and the proposed transactions contemplated within this Plan with your attorney prior to deciding on whether to accept or reject the Plan. If you do not have an attorney, you may wish to consult one.**

# II.  DEFINED TERMS AND RULES OF CONSTRUCTION

**2.1.  Defined Terms.** Unless context requires otherwise, or a term is defined elsewhere in this Plan, the definitions enumerated under 11 U.S.C. § 101 shall apply as supplemented by such certain and specific terms when used in capitalized form, as follows:

**2.1.1.  Administrative Expense** means, when referring to a Claim, any cost or expense incurred to administer the Estate during the Case, as Allowed under 11 U.S.C. §§ 503(b) and 507(a)(2) including, but not limited to, (a) the actual and necessary costs and expenses of preserving the Bankruptcy Estate, (b) Professional Fees, (c) any fees or charges assessed against the Bankruptcy Estate under 28 U.S.C. § 1930, (d) all Post-Petition taxes assessed against the Debtor, (e) any Claims for the value of goods received pursuant to 11 U.S.C. § 503(b)(9); (f) and all other Claim(s) entitled to Administrative Expense Claim status pursuant to a Final Order including, but not limited to, any Claims under 11 U.S.C. § 507(b) incurred from the Petition Date through the Effective Date.

**2.1.2.  Aesthetic Services** means services rendered and goods sold for which requires a licensed physician to oversee, supervise, and/or delegate to qualified individuals the care and treatments performed including, but not limited to, body toning, cellulite reduction, fat removal, laser hair removal, needle-free facial-sculpting, and skin tightening.

**2.1.3.  Allowed** means any Claim, or applicable portion thereof, that has been, or currently is: (a) "Allowed" by a Final Order; (b) Scheduled, other than a Claim that has been Scheduled as disputed, contingent or unliquidated, and which Scheduled Claim has not been superseded by a Proof of Claim; (c) subject of a timely filed Proof of Claim without any objection or motion to subordinate, Disallow, or otherwise limit recovery has been made filed within the Case prior to the Claim Objection Deadline; or (d) has been specifically "Allowed" pursuant to the Plan.

**2.1.4.  Anniversary** means a 1-year interval of time following the Effective Date.

2

**2.1.5.** **Assets** means all tangible and intangible property, rights and interests of every kind and nature owned, controlled, maintained and/or operated by the Debtor and/or the Bankruptcy Estate as provided under 11 U.S.C. §§ 541 and 1186 including, but not limited to, any Causes of Action and all proceeds thereof, existing as of the Effective Date, except those released under the Plan or a Final Order.

**2.1.6.** **Assumed Contract(s)** means any Executory Contract or Unexpired Lease the Debtor assumes in accordance with Article VIII of the Plan and 11 U.S.C. § 365.

**2.1.7.** **Ballot(s)** means the form attached hereto as **EXHIBIT 8** and incorporated by reference herein upon which Eligible Voters shall, among other things, indicate whether to accept or reject the Plan.

**2.1.8.** **Bankruptcy Case**, or **the/this Case**, means the case under Chapter 11 of the Code for the Debtor pending before the Court; styled as, *In re Center for Alternative Medicine, PLLC.*, Case No. 23-12482-JGR.

**2.1.9.** **Bankruptcy Code**, or **the Code**, means the Bankruptcy Reform Act of 1978, as codified under Title 11 of the United States Code, 11 U.S.C. § 1010, *et seq.*, and any amendments thereof, as effective on the Petition Date and applicable to this Case.

**2.1.10.** **Bankruptcy Court**, or **the Court**, means the United States Court for the District of Colorado, which is the venue for the Case.

**2.1.11.** **Bankruptcy Estate**, or **the Estate**, means the any and all equitable or legal ownership interest in the Assets, among any other property defined under 11 U.S.C. § 541, which the Debtor owned, controlled, possessed and/or maintained as of the Petition Date, or acquired thereafter up to and through either: (a) the Effective Date following a Consensual Confirmation or (b) the earlier date that the Case is closed, dismissed, or converted to Chapter 7 of the Code if following a Cramdown Confirmation.

**2.1.12.** **BTL** means BTL Industries. Inc., a Delaware corporation with a principal place of business located at 362 Elm Street, Marlborough, Massachusetts 01752.

**2.1.13.** **Business Day** means a day other than a Saturday, Sunday, legal holiday, or any other day the Court is authorized or required by law to close.

**2.1.14.** **Cash** means the legal tender of the United States of America, or the equivalent thereof, including, but not limited to, bank deposits and checks.

**2.1.15.** **Cash Collateral** means the definition ascribed under 11 U.S.C. § 363(a).

**2.1.16.** **Cash Disbursements, or Net Expenses**, means Cash tendered on account of events, transactions, or occurrences arising from, related to, and/or contemplated within (a) the budget attached to (i) *Debtor's Stipulation with Colorado Department of Revenue for Use of Cash Collateral* [Dkt. No. 29]; (ii) *Stipulation with CAN Capital, Inc. for Use of Cash Collateral and Provide Adequate Protection* [Dkt. No. 31]; and/or *Motion for Entry of Interim Order to Authorize Use of Cash Collateral and Provide Adequate Protection* [Dkt. No. 33]; (b) incurred in the ordinary course of business; (c) necessary for the continuation, preservation, and operation of the business regardless of whether now known, recurring, and/or the effect of unforeseeable extraordinary circumstances; and/or (d) a cost or expense incurred that is ordinary according to industry customs and standards.

**2.1.17. Cash Receipts** means the total sum of Cash the Debtor receives on account of services rendered and/or goods sold for any given period.

**2.1.18. Cause(s) of Action** means any and all claims, actions, suits, appeals, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims of the Debtor and/or the Bankruptcy Estate, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, against any Person or Entity, based in law or equity, including under the Code, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the entry of the Confirmation Order, unless otherwise waived or released by the Debtor during the Case, under this Plan, the Confirmation Order or any other Final Order.

**2.1.19. Chiropractic Equipment** means furniture, fixtures, and devices used to perform Chiropractic Services including, but not limited to, as follows:

**2.1.19.1. EMSculpt** means BTL EMSculpt with Small Contour Applicator, Serial Number ("*S/N*") A799.001S.

**2.1.19.2. EMSella** means BTL EMSella Chair, S/N A799.001UPG-U.

**2.1.19.3. Lasers** means, collectively, Erchonia Corporation EVRL S/N EVRL-09477, FX-635 S/N HPS-00265, and Zerona Z6 S/N SHR-00281.

**2.1.19.4. X-Ray** means Samsung Digital Chiropractic Digital Radiographic System.

**2.1.20. Chiropractic Services** means holistic, non-invasive, and non-surgical services rendered and goods sold in furtherance of chiropractic, acupuncture, physiotherapy, electro-physiotherapy, and massage therapy treatments for which do not require a physician license to include, without limitation, alleviating spinal decompression, disc lesions, tendonitis, and peripheral neuropathy, among other health conditions.

**2.1.21. Claimant** means a Person or Entity that holds a Claim against the Debtor that arose Pre-Petition and/or a Person or Entity that has a Claim against the Estate of a kind specified in 11 U.S.C. §§ 348(d), 502(f), 502(g), 502(h), or 502(i). Hereinafter, certain Claimants, together with assignors thereto, shall be abbreviated as follows:

**2.1.21.1. Amur** means Amur Equipment Finance, Inc., a Nebraska Entity with a principal place of business at 304 West 3rd Street, Grand Island, Nebraska 68801.

**2.1.21.2. BFG** means BFG Corporation, *doing business as* Byline Financial Group, an Illinois Entity with a principal place of business at 2801 Lakeside Drive, Suite 212 Bannockburn, Illinois 60015.

**2.1.21.3. CAN** means CAN Capital, Inc., a Delaware Entity with a principal place of business at 1850 Parkway Place, Suite 1150, Marietta, Georgia, 30067.

**2.1.21.4. DLL** means De Lage Landen Financial Services, Inc., a Michigan Entity with a principal place of business at 1111 Old Eagle School Road, Wayne, Pennsylvania 19087.

**2.1.21.5. Dext** means Dext Capital, LLC, a Delaware Entity maintaining a principal place of business at 4000 Kruse Way Place, Building 3 Suite 100, Lake Oswego, Oregon 97035.

**2.1.21.6. MMP** means MMP Capital Inc., a New York Entity with a principal place of business at 19 Engineers Lane, Farmingdale, New York 11735.

4

   **2.1.21.7.**  **NEC** means NEC Financial Services, LLC, a Delaware Entity with a principal place of business at 250 Pehle Avenue Suite 203, Saddle Brook, New Jersey, 07663.

   **2.1.21.8.**  **NMEF** means North Mill Equipment Finance LLC, a Delaware Entity with a principal place of business at 601 Merritt 7, 5th Floor, Norwalk, Connecticut 06851.

   **2.1.21.9.**  **Pawnee** means Pawnee Leasing Corporation, a Colorado Entity with a principal place of business at 3801 Automation Way, Suite 207, Fort Collins, Colorado 80525.

   **2.1.21.10.** **Stearns** means Stearns Bank, National Association, a national bank registered within Minnesota under the trade name Stearns Bank Equipment Finance Division with a principal place of business at 4191 Second Street South, Saint Cloud, Minnesota 56301.

   **2.1.21.11.** **Tandem** means Tandem Finance Inc., a Colorado Entity with a principal place of business at 3801 Automation Way, Suite 207, Fort Collins, Colorado 80525.

  **2.1.22.** **Claims Analysis** means the table of information attached hereto as **EXHIBIT 2** and incorporated by reference herein.

  **2.1.23.** **Claims Bar Date** means August 16, 2023 as the deadline for Persons or Entities to file Proofs of Claim in the Case as designated by the Court within the *Order and Notice of: (1) Status Conference Under 11 U.S.C. § 1188; and (2) Deadline for Filing Proofs of Claims* entered on June 12, 2023. Dkt. No. 19, p.2 (¶4)

  **2.1.24.** **Claim Objection Deadline** means the later of (1) one hundred eighty (180) days following the Effective Date, (2) sixty (60) days following the deadline designated under the Plan to file a Proof of Claim on account of a Deficiency Claim or Rejection Claim; or (3) such other date as may be fixed and/or extended by the Court upon the Debtor or Disbursing Agent filing a motion, subject to notice and a hearing, prior to the expiration of the applicable deadline.

  **2.1.25.** **Class(es)** means a category of Holders of Claims or Equity Interests substantially similar in nature to the Holders of other Claims or Equity Interests placed in that category, as designated within Article VI of the Plan in accordance with 11 U.S.C. § 1122(a).

  **2.1.26.** **Collateral** means an Asset subject to a Security Interest the Debtor pledged to a Claimant to secure payment or performance of a Claim, which is perfected and not subject to avoidance, or otherwise invalid or unenforceable, under the Code and/or non-bankruptcy law.

  **2.1.27.** **Confirmation Date** means the date the Court enters the Confirmation Order on the docket of this Case, pursuant to FED.R.BANKR.P. 5003 and 9021.

  **2.1.28.** **Confirmation Order** means the Final Order of the Court confirming the Plan pursuant to 11 U.S.C. §§ 1129 and 1191, together with any other applicable provisions of Chapters 3, 5, and 11 of the Code.

  **2.1.29.** **Contracts List** means the Schedule of Executory Contracts and Unexpired Leases Treatment attached hereto as **EXHIBIT 5** and incorporated by reference herein.

  **2.1.30.** **Consensual Confirmation** means Confirmation of the Plan arising upon all Classes of Claims voting to accept the Plan, pursuant to 11 U.S.C. § 1191(a).

  **2.1.31.** **Consummation** means the occurrence of the Effective Date.

  **2.1.32.** **COS Office** means a certain and specific commercial premises located at 11590 Ridgeline Drive, Suite 130, Colorado Springs, Colorado 80921.

**2.1.33. Cramdown Confirmation** means Confirmation of the Plan following any Class of Claims voting to reject the Plan, pursuant to 11 U.S.C. § 1191(b).

**2.1.34. Cure** means, with respect to the assumption of an Executory Contract or Unexpired Lease pursuant to 11 U.S.C. § 365(b), either: (1) Distribution of Cash or such other property as may be agreed upon by the parties or the Court may order in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Code and applicable non-bankruptcy law; or (2) the Debtor performing such other actions as the parties may agree or the Court may order.

**2.1.35. Debtor or Debtor-in-Possession** means Center for Alternative Medicine, PLLC.

**2.1.36. Default Event** means any act or omission contrary to the provisions of the Plan, Confirmation Order, and/or any applicable non-bankruptcy law and regulation including, but not limited to, the Debtor or any Claimant failing to perform in accordance with every term and covenant of the Plan.

**2.1.37. Default Notice** means notice setting forth the nature and extent of a Default Event served upon the Debtor, Counsel for the Debtor, any Claimant or interested party requesting notice of the Case after the Effective Date in accordance with Section 13.4 *infra*, and the Defaulting Party as such term is defined under Article XI *infra*.

**2.1.38. Deficiency** means the shortfall between the total amount of a Claim secured by a valid, perfected, and enforceable Security Interest against an Asset of the Estate and the value of the Estate's interest in the Asset determined by either: (1) the Cash proceeds realized from a sale or other disposition of the Collateral in a commercially reasonable manner; (2) determination by the Court pursuant to 11 U.S.C. § 506(a) and Fed.R.Bankr.P. 3012; or (3) such other amount as may be agreed upon by the Debtor and the Claimant under the Plan, subject to entry of the Confirmation Order, pursuant to L.B.R. 3012-1(b).

**2.1.39. Depository Account** means an account maintained with ENT Credit Union when referring to Pre-Petition Depository Accounts or, when referring to Post-Petition Depository Accounts, a financial institution that the UST identifies as an authorized depository; and more-specifically, as follows:

    **2.1.39.1. Disbursement Account** means the Depository Account the Disbursing Agent shall maintain with Integrity Bank and Trust ("***Integrity***") commencing on or before the Effective Date to which the Debtor shall deposit and from which Holders of Allowed Claims shall receive Distributions of Plan Payments; and more specifically shall be either: (a) Integrity Account No. x4015 following a Consensual Confirmation; or (b) an account the Trustee shall open with Integrity following a Cramdown Confirmation.

    **2.1.39.2. Operating Account** means Integrity Account No. x0893, which the Debtor shall continue to maintain for deposits of Cash receipts and payment of Net Expenses.

**2.1.40. Disallowed** means a Claim, or the applicable portion thereof, that the Court has disallowed by a Final Order including, for the avoidance of doubt, the Confirmation Order.

**2.1.41. Disbursing Agent** means the Person or Entity assigned the rights and responsibilities of distributing Plan Payments to Holders of Allowed Claims in accordance with the Plan, pursuant to 11 U.S.C. §§ 1183 or 1194(b).

**2.1.42. <u>Discharge Date</u>** means the date and time the Court enters an Order of Discharge in favor of the Debtor within the Case, which shall occur on or after, and no earlier than: (a) the Effective Date if following a Consensual Confirmation; or (b) until the Court grants a discharge upon full Distribution of Plan Payments if following a Cramdown Confirmation.

**2.1.43. <u>Disposable Income</u>** means the sum of Net Income less Plan Payments the Debtor projects to earn, retain, and Distribute during the Plan Term for the benefit of Claimants based on assumptions computed within the Disposable Income Projections.

**2.1.44. <u>Disposable Income Projections</u>** means the formulation of Disposable Income within the Statement of Projected Income, Expenses, and Cash Flow attached hereto as **EXHIBIT 1** and incorporated by reference herein.

**2.1.45. <u>Disputed</u>** means a Claim, or any applicable portion thereof, that is neither an Allowed nor Disallowed Claim under the Plan, the Code, or by a Final Order to which (1) a Proof of Claim has been filed or deemed filed and the Debtor or another interested party with standing has raised a timely objection; or (3) no Proof of Claim was filed prior to the Claims Bar Date for a Claim the Debtor Schedules as disputed, unliquidated, or contingent.

**2.1.46. <u>Distribute(d), or Distribution</u>**, means the transaction of tendering a Plan Payment to the Holder of an Allowed Claim on (1) the postmarked date if tendered through United States mail; or (2) the date authorized by the Disbursing Agent if tendered by electronic means.

**2.1.47. <u>Effective Date</u>** means the date on which the Plan shall take effect, which shall be either (1) the greater of the first (1st) Business Day following the date that is fourteen (14) days following the Confirmation or the 1st month following the Confirmation Date; or (2) if a stay of the Confirmation Order is in effect on that date, the 1st Business Day after such stay is no longer in effect provided that the Confirmation Order has not been vacated.

**2.1.48. <u>Eligible Voter</u>** means a Claimant entitled to vote to accept or reject the Plan as the Holder of a Claim classified within a Voting Class.

**2.1.49. <u>Eliminated</u>** means the deletion of a Class from the Plan for purposes of determining acceptance or rejection of the Plan by such Class, pursuant to 11 U.S.C. § 1129(a)(8).

**2.1.50. <u>Estimated</u>** means either (1) a Deficiency Claim that the Holder thereof has neither attached to a Proof of Claim nor presented to the Debtor an accounting of the proceeds from disposition of the Collateral in support of an Allowed Claim for which the Debtor shall estimate as a contingent, unliquidated, and Disputed Claim in an amount arising from: (a) representations made by the Claimant subject to Fed.R.Bankr.P. 9011, (b) the Claim amount less the value of the Collateral disclosed within the Proof of Claim, or (c) the Debtor's Schedules; or (2) a Disputed Claim that the Debtor requests for the Court to estimate pursuant to applicable law including, but not limited to 11 U.S.C. § 502(c), regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection; and, in the event the Court estimates any Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of voting, Treatment, and Distributions for which the Debtor may elect to pursue additional objections to the ultimate distribution on such Claim or, if the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any proceedings to object to any ultimate Distribution on account thereof.

**2.1.51. <u>Executory Contract(s)</u>** means a contract to which the Debtor is a party that is subject to assumption or rejection under 11 U.S.C. §§ 365 and/or 1123(b)(2), and "the obligations of both…part[ies] to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." *In re Baird*, 567 F.3d 1207, 1210 (10th Cir.2009) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973)).

**2.1.52. <u>Federal Rules</u>** means (1) Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under 28 U.S.C. § 2075, hereinafter cited to as FED.R.BANKR.P.; (2) Federal Rule of Civil Procedure, hereinafter cited to as FED.R.CIV.P.; (4) United States Bankruptcy Court for the District of Colorado Local Bankruptcy Rules, effective December 1, 2021, hereinafter cited to as L.B.R.; (4) general or specific chamber rules or procedures, or standing orders governing practice and procedure issued by the Court; and (5) all amendments and modifications thereto effective as of the Petition Date and applicable to this Case.

**2.1.53. <u>Final Cash Collateral Order</u>** means the *Final Order (A) Authorizing Debtor's Post-Petition Use of Cash Collateral and (B) Granting Adequate Protection to Pre-Petition Secured Parties* entered by the Court on August 3, 2023. Dkt. No. 76.

**2.1.54. <u>Final Decree</u>** means an order entered by the Court closing the Case following the filing of a Final Report and motion for a final decree, pursuant to 11 U.S.C. § 350, FED.R.BANKR.P. 3022, and L.B.R. 3022-1.

**2.1.55. <u>Final Order</u>** means an order or judgment of the Court, as entered on the docket in the Case, the docket of any applicable ancillary adversary proceedings and Cases before the Court, or the docket of any other court of competent jurisdiction that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, re-argument, reconsideration, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, or motion for re-argument, reconsideration, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

**2.1.56. <u>Final Use Stipulations</u>** means *Debtor's Stipulation with Colorado Department of Revenue*… [Dkt. No. 29-1] and *Stipulation with CAN Capital, Inc*… [Dkt. No. 31-1] filed within the Case on June 26, 2023.

**2.1.57. <u>Financial Disclosures</u>** means the *Balance Sheet as of June 7, 2023*, *Statement of Cash Flows*, *Profit and Loss*, and tax returns for calendar year 2021 filed within the Case on June 15, 2023. Dkt. Nos. 23-26.

**2.1.58. <u>Financing Statement</u>** incorporates the definition ascribed under COLO.REV.STAT. § 4-9-102(39) to mean a record or records filed with the State Secretary as proof that such Person or Entity holds a valid and effective security interest encumbering an Asset or Assets of the Estate arising under an agreement the Debtor executed in favor of the applicable Claimant, and any record or records filed with the State Secretary relating thereto.

**2.1.59. <u>Formation Date</u>** means February 7, 2013, which is the date the Debtor formed by filing Articles of Organization with the Colorado Secretary of State.

**2.1.60.** **Governmental Unit** means the definition ascribed under 11 U.S.C. § 101(27), which includes, but is not limited such Persons or Entities abbreviated hereinafter, as follows:

**2.1.61.1.** **CDOR** means Colorado Department of Revenue.

**2.1.61.2.** **CMS** means United States Centers for Medicare and Medicaid Services.

**2.1.61.3.** **FDA** means the United States Food and Drug Administration.

**2.1.61.4.** **HHS** means the United States Department of Health and Human Services.

**2.1.61.5.** **UST** means the Office of the United States Trustee.

**2.1.61.** **Gross Receipts** means, for any given period, the total sum of Cash the Debtor receives on account of services rendered and/or goods sold less the costs of job materials and merchant servicing fees actually paid during such same period.

**2.1.62.** **Holder(s)** means any Person or Entity holding a Claim or Interest.

**2.1.63.** **Impaired** means a Class of Claims for which the Plan alters the legal, equitable and/or contractual rights of the Holder(s) of such Claim(s) thereof.

**2.1.64.** **Initial Schedules** means the *Voluntary Petition for Non-Individuals Filing for Bankruptcy* ("*Voluntary Petition*"), lists, resolutions, schedules, statements, and disclosures filed within the Case on June 21, 2023. Dkt. Nos. 1-9, 27-28.

**2.1.65.** **Interim Use Motion** means the *Motion for Entry of Interim Order to Use of Cash Collateral and Provide Adequate Protection* filed within the Case on June 28, 2023. Dkt. No. 33.

**2.1.66.** **Interest** means all previously issued and outstanding common stock, preferred stock, membership interests, or other ownership interests in the Debtor issued and outstanding immediately prior to the Effective Date, including any and all options, warrants, calls, rights, puts, awards, commitments, appreciation rights, or any other agreements of any character to convert, exchange, exercise for, or otherwise receive any such common stock, preferred stock, membership interests, or other ownership interests

**2.1.67.** **Late Claim(s)** means any Proof of Claim filed after the Claims Bar Date.

**2.1.68.** **Liquidation Analysis** means the table of information attached hereto as **EXHIBIT 3** and incorporated by reference herein.

**2.1.69.** **Lumenis** means Lumenis BE Inc., a Delaware corporation with a principal place of business located at 2077 Gateway Place, Suite 300, San Jose, California 95110.

**2.1.70.** **Net Cash Flow** means Cash Receipts less Cash Disbursements.

**2.1.71.** **MOR(s)** means Official Form 425C: Monthly Operating Report for Small Business Under Chapter 11, together with the statements and disclosures attached thereto, filed within the Case on or before the twenty-first (21st) day of each month following the close of the applicable monthly period reported.

**2.1.72.** **Net Income** means Gross Profits less Net Expenses.

**2.1.73.** **Nutritional Services** means holistic, non-invasive, and non-surgical services rendered and goods sold in furtherance of providing preventative care for which the care provided does not require a physician license to include, without limitation, performing nutritional and

metabolic counseling to assist patients with food sensitivities, weight loss, and developing home exercise programs and diet regimens.

**2.1.74. Petition Date** means June 7, 2023.

**2.1.75. Plan** means the *Third Amended Plan of Reorganization for Small Business Under Subchapter V of Chapter 11 Dated February 13, 2024* and all exhibits attached thereto, either in its present form or as may be altered, amended, modified, or supplemented from time to time as the Debtor may propose and/or the Court may require hereafter.

**2.1.76. Plan Payment(s)** means Cash that the Debtor shall deposit into the Creditor Disbursement Fund and the Disbursing Agent shall Distribute to Holders of Allowed Claims in accordance with the Plan.

**2.1.77. Plan Term** means the three (3) year period commencing on the Effective Date.

**2.1.78. Post-Petition** means any date and time after June 7, 2023 at 9:25 p.m. up to and through the Confirmation Date.

**2.1.79. Pre-Petition** means any date and time prior to June 7, 2023 at 9:25 p.m.

**2.1.80. Priority** means, when referring to a Claim, any person or entity afforded Priority in right of payment under 11 U.S.C. § 507(a), other than a Priority Tax Claim or Administrative Expense Claim.

**2.1.81. Priority Tax** means, when referring to a Claim, any Priority Claim of a Governmental Unit of the kind specified in 11 U.S.C. § 507(a)(8).

**2.1.82. Pro-Rata or Pro-Rata Share** means the proportionate share of any Distribution calculated by dividing the amount of a Claimant's Allowed Claim by the aggregate amount of all Allowed, Disputed and Estimated Claims in such Class.

**2.1.83. Professional(s)** means any Person or Entity: (a) retained in the Case pursuant to a Final Order in accordance with 11 U.S.C. §§ 327 or 328; (b) to be compensated for services rendered and expenses pursuant to 11 U.S.C. §§ 329, 330, and/or 331; (c) duly-appointed by the UST, pursuant to 28 U.S.C. § 586(a)(1), to perform the duties enumerated under 11 U.S.C. §§ 1183, 1189, and/or 1194(b); (d) seeking compensation and reimbursement of expenses pursuant to 11 U.S.C. §§ 503(b)(3) or (b)(4); and/or (e) such certain Persons and Entities, as follows:

**2.1.83.1. Accountant** means Karen E. Heerschap of HEWITT HEERSCHAP & COUCH P.C., together with its managers, members, partners, associates, and employees, to the extent permitted by the Court.

**2.1.83.2. Counsel** means Joshua B. Sheade, Esq. of SHEADE LAW OFFICE, LLC, together with its managers, members, partners, associates, employees, and agents, to the extent permitted by the Court.

**2.1.83.3. Trustee** means Mark D. Dennis, CPA, as the Person duly appointed by the UST to operate as the Subchapter V Trustee in the Case, together with his partners, associates, employees, and agents, to the extent permitted by the Court.

**2.1.84. Professional Fee** means, when referring to a Claim, compensation due and owing to a Professional for services rendered and expenses incurred prior to the Effective Date on the Estate's behalf, to the extent Allowed under 11 U.S.C. §§ 327, 331, 503(b), 1103, or 1106 and pursuant to a Final Order of the Court.

**2.1.85. Proof(s) of Claim** means a Claim filed within the Case in substantial conformity with Official Form 410 and in accordance with FED.R.BANKR.P. 3001 and 3002.

**2.1.86. Pueblo Office** means a certain and specific commercial office building consisting of two (2) suites located at 2501 and 2505 Kachina Drive, Pueblo, Colorado 81008.

**2.1.87. Rejected Contract(s)** mean any Executory Contract or Unexpired Lease the Debtor rejects in accordance with Article VIII of the Plan and 11 U.S.C. § 365.

**2.1.88. Rejection** means, when referring to a Claim, the amounts due resulting from a Rejected Contract.

**2.1.89. Restricted Device(s)** means the definition ascribed under 21 CFR § 807.3(i). As applicable hereto, the FDA regulates as Restricted Devices such equipment, together with any accessories, attachments, and/or replacement parts thereto, as follows:

**2.1.90.1. Cellutone** means BTL Cellutone Workstation, S/N 0440B011956.

**2.1.90.2. EMFace** means BTL EMFace Workstation, S/N 785F5B000505.

**2.1.90.3. EMSculpt NEO** means BTL EMSculpt NEO with Small RF+HIFEM Applicators, S/N A899.001/130.

**2.1.90.4. EMTone** means BTL Emtone V2 Workstation S/N 08400B000698, BTL Large App Kit S/N 799C1B005475, and Fixation Straps, S/N POP246702.

**2.1.90.5. Exilis** means BTL Exilis Ultra System, S/N Exilis Ultra®.

**2.1.90.6. Neo+Exilis** means, collectively, the EMSculpt Neo and the Exilis.

**2.1.90.7. Splendor X** means Lumenis Trilift Splendor X Workstation S/N SPXAY22C-091481 and Zimmer MedizinSystems Cryo 6 with Accessories S/N 2220012561.

**2.1.90. Scheduled** means documents, records, and/or information the Debtor disclosed within the Schedules filed with the Court under Bankruptcy Rule 1007, together with any amendments or supplements thereto.

**2.1.91. Scheduling Order** means the *Order Setting Hearing on Confirmation of Small Business Chapter 11 Subchapter V Plan and Notice of Deadlines* attached hereto as **EXHIBIT 7-1** and incorporated by reference herein.

**2.1.92. Schedules** means, collectively, the Initial Schedules; Financial Disclosures; *Amended Schedule A/B: Assets – Real and Personal Property*, *Amended Schedule G: Executory Contracts and Unexpired Leases* ("*Schedule G*"), and *Amended Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* filed on August 1, 2023 [Dkt. No. 69]; and Second Amended Schedule G filed on September 15, 2023 [Dkt. No. 96].

**2.1.93. Secured** means, when referring to a Claim secured by a valid, perfected, and enforceable Lien against an Asset that the Estate, or that is subject to setoff pursuant to 11 U.S.C. § 553, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable.

**2.1.94. Substantial Consummation** means as defined under 11 U.S.C. § 1101(2).

**2.1.95. Till Rate** means the "formula rate" of interest to be fixed for the entirety of the Plan Term commencing on the Confirmation Date of seven percent (7.00%) per annum, measured as the average   of the Prime Rate, Effective Federal Funds Rate, 3 month LIBOR Rate, six (6) month

Treasury Bill Rate, U.S. ten (10) year Treasury Note Rate, and U.S. Treasury Bond Rate on the date of the Plan (i.e. 5.45%) and adjusted upward to accommodate the risk of non-payment posed by the Debtor, in accordance with *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951, 158 L.Ed.2d 787 (2004).

**2.1.96.** **Treatment** means the consideration Cash amount each Claimant shall receive under the Plan, and the time for recovery of such Plan Payments.

**2.1.97.** **Unclassified Claim(s)** means any Claims not classified in the Classes of Claims set forth in Article VI of the Plan, as arising under 11 U.S.C. §§ 507(a)(2), (a)(3), and (a)(8), in accordance with 11 U.S.C. § 1123(a)(1).

**2.1.98.** **Unexpired Lease(s)** means a Pre-Petition agreement for rental of real property.

**2.1.99.** **Unimpaired** means, with respect to a Claim or Class of Claims, the definition ascribed under 11 U.S.C. § 1124(1).

**2.1.100.** **Unsecured** means, when referring to a Claim, any Claim against the Debtor that is not otherwise either paid in full during the Case pursuant to an order of the Court, an Administrative Expense Claim, Priority Claim or Priority Tax Claim; and shall include any deficiency amount of a Claim arising to the Holder of an Allowed Secured Claim under 11 U.S.C. § 506, after notice and a hearing pursuant to FED.R.BANKR.P. 3012 or resulting from any agreement reached between the Claimant and the Debtor in which it is determined that the value of the Collateral securing the Claim is less than the Allowed Claim.

**2.1.101.** **Vacant** means a Class of Claims or Interests that does not contain, upon commencement of the Confirmation Hearing, a Holder of a Claim or Interest either Allowed or temporarily Allowed under FED.R.BANKR.P. 3018.

**2.1.102.** **Voting Class** means a Class of Claims Interests entitled to vote to accept or reject the Plan as Holders of Impaired Claims, pursuant to 11 U.S.C. § 1126(a).

**2.1.103.** **Voting Deadline** means the deadline established by the Court within the Scheduling Order as the date the Debtor must have actually received Ballots from Eligible Voters.

**2.2.** **Rules of Construction.** Unless otherwise expressly set forth in the Plan, Confirmation Order, or any other agreement or document entered into expressly in connection with the Plan; rules of construction set forth in 11 U.S.C. § 102 shall apply as supplemented by certain rules of construction, as follows: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2), reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) reference to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) use of "Article(s)" or "Section(s)" refers to Articles and Sections within the Plan; (5) "herein," "hereto," and/or "hereof" refers to the Plan in its entirety rather than to any particular portion thereof; (6) "Dkt. No. __" refers to the docket number of the pleading, document, notice, or order entered on the docket of the Case maintained through Case Management/Electronic Case Filing ("***CM/ECF***"); and (7) "Claim No. " refers to a Proof of Claim filed on the Claims Register for the Case maintained through CM/ECF.

### III.   DISCLOSURES UNDER SUBCHAPTER V OF CHAPTER 11

Pursuant to 11 U.S.C. § 1190(1), the Debtor discloses, as follows:

**3.1.   Pre-Petition Material Events.** The Debtor is a Colorado professional limited liability company that commenced the Case due to such Pre-Petition transactions and affairs, as follows:

    **3.1.1.   Management and Ownership.** On the Formation Date, Theodore Davis maintained a ten percent (10.0%) membership interest in the Debtor and Steven R. Mooring, DC controlled the remaining ninety percent (90.0%) interest. As consideration for agreeing to jointly manage and operate the Debtor with Dr. Mooring, Mr. Davis received an additional 10.0% ownership interest on the first (1st) day of every year following the Formation Date up to and through Dr. Mooring selling his remaining seventy percent (70.0%) membership interest to Mr. Davis under an Agreement for Purchase entered on January 15, 2015. Therefore, Mr. Davis has controlled a one hundred percent (100.0%) membership interest in the Debtor since January 15, 2015 and was the president, manager, and sole member of the Debtor as of the Petition Date. As managing member, Mr. Davis has overseen the Debtor's operations and financial affairs with the assistance of an office manager tasked with day-to-day logistical and financial duties including, but not limited to, billing, recordkeeping, and overseeing compliance with internal policies.

Furthermore, the Debtor has continuously employed Mr. Davis on a full-time basis since the Formation Date to perform Chiropractic Services as Mr. Davis earned a Bachelor of Science in biology from the University of Washington in 2007, a Master of Science in Sports Science and Rehabilitation and a Doctor of Chiropractic Medicine from Logan University in 2011, a Certification in Acupuncture from Texas Chiropractic College in 2013, and has maintained a chiropractic license within Colorado since April 28, 2011 together with authority under such license to perform electrotherapy since April 28, 2011 and acupuncture since August 12, 2013.

    **3.1.2.   Pre-Petition Operations.** To err is human, and the Debtor acknowledges that the paths forged in the past led to this Case. Nonetheless, "[i]n history, a great volume is unrolled for our instruction drawing the materials of future wisdom from the past errors."[2] Therefore, the Debtor hereby revisits and seeks to learn from such past events leading to this Case, as follows:

        **3.1.2.1. Nature of Operations.** Since the Formation Date, the Debtor has provided Chiropractic Services and Nutritional Services as a chiropractic clinic within the Pueblo Office. Although the Debtor consistently grew from sales of Chiropractic Services, such revenues were subsidizing the losses incurred from a low retention rate and lack of interest in Aesthetic Services. More specifically, the Debtor invoiced for services rendered and goods sold from July 1 through December 31 ("*2nd Half*") of calendar years 2019 through 2022, as follows:

| Services by Year | Aesthetic Services | | Chiropractic Services | | Nutritional Services | | Total Sales | |
|---|---|---|---|---|---|---|---|---|
| | Amount | Portion | Amount | Portion | Amount | Portion | Amount | Portion |
| Jul–Dec '19 | $ 0.00 | 0.00% | $ 707,371.96 | 90.90% | $ 70,856.99 | 9.10% | $ 772,228.95 | 16.87% |
| Jul–Dec '20 | $ 0.00 | 0.00% | $ 756,498.41 | 98.41% | $ 12,214.91 | 1.59% | $ 768,713.32 | 16.67% |
| Jul–Dec '21 | $ 81,007.00 | 5.83% | $1,264,274.35 | 91.03% | $ 43,499.61 | 3.13% | $ 1,388,780.96 | 30.11% |
| Jul– Dec '22 | $ 66,474.00 | 3.97% | $1,586,751.61 | 94.66% | $ 23,107.07 | 1.38% | $ 1,676,332.68 | 36.35% |
| **Service Total** | **$ 147,481.00** | **3.20%** | **$4,314,896.33** | **93.56%** | **$ 149,678.58** | **3.25%** | **$ 4,612,055.91** | **--** |

---

[2]   Edmund Burke, Reflections on the Revolution of France, para. 242 (1790).

Therefore, the origins and demise of Aesthetic Services are more-fully discussed hereinafter.

        **3.1.2.2. <u>Rapid Growth Leads to Increased Costs, Not Profits.</u>** On August 27, 2019, the Debtor purchased the EMSculpt as approved by insurance providers to treat muscle injuries and a weight loss treatment requested by Nutritional Services patients. Such purchase led to an eighteen percent (18.30%) increase in Gross Profits between calendar years 2019 and 2020, which the Debtor applied towards the purchase of the EMSella on March 19, 2020. Furthermore, patients requesting additional Aesthetic Services and representations by BTL convinced the Debtor to purchase the EMTone – as an upgrade for the EMSculpt – and hire a certified nurse practitioner to perform Aesthetic Services on or about December 21, 2020. Although BTL represented that the EMTone was a cost-effective alternative to the EMSculpt NEO, as the collective application of the EMSculpt and EMTone purportedly lead to the same result, patients disagreed and the EMTone generated approximately one percent (1.02%) of total sales from January 1, 2021 through the Petition Date. Nonetheless, interest in the EMSculpt and EMSella combination spawned a forty-five percent (45.32%) year-over-year growth during the COVID-19 pandemic; and the projected return on investment computed therefrom led to the Debtor purchasing the NEO+Exilis, funding improvements to the Pueblo Office, and rebranding Aesthetic Services as The Wellness Spa at CAM commencing on January 13, 2022. Due to such investments, sales further increased eleven and one-half percent (11.50%) between calendar years 2021 and 2022.

However, the Debtor did not anticipate the additional imputed costs associated with Aesthetic Services. For example, regulations promulgated by the FDA and the Colorado Medical Board, read together, requires a licensed physician to own and supervise the use of the Restricted Devices;[3] and the customary compensation paid to a medical director is 10.0% of services performed under the licensee's delegation, irrespective of the portion collected. Therefore, the Debtor could not operate the Restricted Devices without funding the additional payroll cost. Furthermore, the Debtor did not maintain sufficient cash flow to purchase the Restricted Devices without financing through MMP and Tandem, as follows:

| Device | Purchase Date | Lender | Assignees | Term | Invoice Total | Loan Total | Installments |
|--------|--------------|--------|-----------|------|--------------:|-----------:|-------------:|
| EMTone | December 21, 2020 | MMP | NMEF | 60 | $ 161,514.00 | $ 226,442.74 | $ 3,896.59 |
| EMSculpt NEO | December 9, 2021 | Tandem | Pawnee | 60 | $ 115,296.00 | $ 334,814.40 | $ 5,580.24 |
| Exilis | | | | | $ 150,992.48 | | |
| EMFace | August 9, 2022 | MMP | NEC | 60 | $ 106,624.00 | $ 146,321.31 | $ 2,398.71 |
| Cellutone | August 9, 2022 | MMP | Amur | 60 | $ 270,290.00 | $ 365,868.60 | $ 6,097.81 |
| Splendor X | September 27, 2022 | MMP | Dext | 60 | $ 166,937.10 | $ 237,892.20 | $ 3,964.87 |
| | | | | **Totals** | **$ 950,365.10** | **$ 1,311,339.25** | **$ 21,938.22** |

Without considering the direct costs to operate the Restricted Devices including, but not limited to maintenance and repair, replacement parts, increased insurance premiums, and operating software subscription fees; the Debtor did not realize sufficient revenue from performing Aesthetic Services to fund the 2 expenses exclusively correlated thereto. For example, the Exilis led to sales of $7,375.00 in 2021 and $1,700 in 2022, while the loan incurred for the purchase of the NEO+Exilis required paying monthly installments of $5,580.24. *Assuming arguendo* the Debtor collected

---

[3]   21 C.F.R. § 801.09; *see also* 3 CCR 713-1; *see also* Colo.Rev.Stat. § 12-240-107(3)(l).

100.0% of services invoiced, paid all loan installments, and no gaps existed between medical directors; it still could not meet the obligations incurred under the Security Agreements without using income generated from Chiropractic Services, as demonstrated by such abbreviated cost accounting of Aesthetic Services, as follows:

| | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|
| **Sales of Service** | $ 32,569.00 | $ 262,674.00 | $ 30,685.00 | $ 325,928.00 |
| **Expenses** | | | | |
| Loan Installments | $ 46,759.08 | $ 185,872.65 | $ 109,691.10 | $ 316,052.83 |
| Medical Director | $ 3,260.00 | $ 26,270.00 | $ 3,070.00 | $ 32,600.00 |
| **Total Added Expenses** | $ 50,019.08 | $ 212,142.65 | $ 112,761.10 | $ 374,922.83 |
| **Net Operating Income** | $ (17,450.08) | $ 50,531.35 | $ (82,076.10) | $ (48,994.83) |

However, the above analysis is misleading insomuch that the Debtor did not consistently employ a medical director between January 1, 2021 up to and through the Petition Date. The aforementioned nurse practitioner resigned on December 31, 2021 due to personal matters requiring her to move out of Colorado, which led the Debtor to hire a licensed physician on or about December 26, 2021 who did not start to provide services until on or about February 1, 2022. Furthermore, the second (2nd) medical director caused additional gaps in offering Aesthetic Services including, but not limited to, the 2 months needed to form a new entity and prepare corporate formalities in or to distance his medical practice from the medical director services performed for the Debtor; the 2 weeks in July and 2 weeks in September 2022 used to locate and commence operations within the COS Office upon convincing the Debtor that adding the COS Office provided the best opportunity to grow the Aesthetic Services; and the inability to find a suitable replacement to accept a comparable salary upon the Debtor finding that the 2nd medical director not providing reasonable and prudent supervision over delegated services and their relationship terminating in or around May 2023.

Nonetheless, the Debtor sought to increase the repeat-customer rate, and thus Net Profits, from Aesthetic Services, by and through, *inter alia*, expending the average monthly sum of $2,850.35 on online marketing services. Although such efforts generated greater Gross Profits, the additional operating costs associated with Aesthetic Services led to a nominal increase or contracted Net Cash Flows for the 2nd Half of 2020 through 2022, as follows:

| Year | Cash Receipts | Disbursements | Net Cash Flow |
|---|---|---|---|
| Jul–Dec 2020 | $ 407,102.85 | $ 378,091.28 | $ 29,011.57 |
| Jul–Dec 2021 | $ 483,450.25 | $ 457,772.73 | $ 25,677.52 |
| Jul– Dec 2022 | $ 350,620.89 | $ 545,684.52 | $ (195,063.63) |
| **3-Year Total** | $ 1,241,173.99 | $ 1,381,548.53 | $ (140,374.54) |
| **3-Year Average** | $ 413,724.66 | $ 460,516.18 | $ (46,791.51) |

Ultimately, Aesthetic Services led to increased Net Expenses and new financing to afford such higher costs, but not greater Net Profits, as patients that initially requested Aesthetic Services opted to not return for further and future treatments. Furthermore, the 2nd medical director no longer performed services upon the relationship terminating, but the Debtor remained liable on debts he persuaded the Debtor to incur under the pretense of being the best opportunity for growth including, but not limited to, the COS Office and financing the purchase of the Cellutone and Splendor X. At first, the twenty-two percent (22.24%) growth (i.e., $267,484.79) in Chiropractic

15

Services was able to subsidize the negative Net Income generated by Aesthetic Services. However, once reserves from Chiropractic Services could no longer fund Aesthetic Service obligations, the Debtor had no choice other than commencing this Case.

**3.2.   Post-Petition Material Events.** Post-Petition events impacting or influencing the Estate and/or the means for implementing this Plan include, but are not limited to, as follows:

**3.2.1. Schedules, Statements, and Disclosures.** Pursuant to the Initial Schedules filed on the Petition Date and June 21, 2023, the Financial Disclosures filed on or about June 15, 2023; Amended Schedule A/B, Amended Schedule G, and an Amended SOFA filed on August 1, 2023, and the 2nd Amended Schedule G filed on September 15, 2023; the Debtor discloses Assets maintaining a collective value of $864,069.11, Claims Secured against such Assets in the sum of $1,250,829.77, Unsecured Claims in the amount of $259,740.00, twenty (20) Executory Contracts for which 14 are subject to a month-to-month term, and 3 Unexpired Leases. Furthermore, the Debtor voluntarily disclosed additional documents, records, and information during the meeting of creditors on July 17, 2023, under the *Affidavit of Theodore W. Davis Pursuant to L.B.R. 2081-1(a)(3)* filed on June 28, 2023, within the *Debtor's Subchapter V Pre-Status Conference Report* filed on July 20, 2023, and when appearing before the Court at the section 1188(a) status conference on August 3, 2023.

**3.2.2.   Professionals Employed.** The Court authorized the Debtor to retain and employ certain Professionals to assist with carrying out the duties imposed upon a debtor-in possession under the Code, as follows: (i) Joshua B. Sheade, Esq. of SHEADE LAW OFFICE, LLC, as Counsel for the Debtor, approved on July 19, 2023, *nunc pro tunc* June 8, 2023; and (ii) Karen E. Heerschap, CPA of HEWITT HEERSCHAP & COUCH P.C., as Accountant for the Estate, approved on August 28, 2023, *nunc pro tunc* July 31, 2023. Contemporaneously with the *Order Authorizing Employment of [the Accountant]*, the Court approved a retainer to the Accountant in the amount of $5,000.00. However, neither Counsel nor the Accountant have filed an interim or final fee application. Therefore, the Distributions to Professionals is subject to change if further work is necessary or the Court finds any services rendered and/or costs incurred to be unreasonable.

**3.2.3.   Use of Cash Collateral.** As of the Petition Date, the Debtor controlled Cash Collateral in the collective sum of $215,448.68, and the Debtor required access to such Cash to, *inter alia*, continue operating and preserve the Assets of the Estate within the 1st week following the Petition Date as it could neither fund payroll nor purchase job materials solely and exclusively with accounts receivables collected for services rendered Post-Petition. However, the Debtor could not access the Cash collected on account of Pre-Petition accounts receivable unless authorized by the Court or Claimants holding a Security Interest in the Cash Collateral consented thereto. Therefore, the Debtor initiated negotiations with CDOR and CAN on June 15, 2023 in lieu of filing and prosecuting a motion under 11 U.S.C. § 363(c)(2)(B), as an effort to preserve estate resources, which culminated in the Debtor executing and filing the Final Use Stipulations within the Case on June 26, 2023. Although CDOR and CAN did not require the Debtor to tender monthly payments as their security interests were adequately protected in the balance of collectible accounts receivable existing on the Petition Date, and consented to the immediate use of Cash Collateral, FED.R.BANKR.P. 4001(d)(2) entitled creditors and interested parties to notice and the opportunity to object to the Final Use Stipulations up to and through July 10, 2023. Meanwhile, the Debtor required access to the Cash Collateral to fund operating expenses becoming due on or before July 12, 2023, which was the earliest the Court could authorize use of Cash Collateral notwithstanding the Debtor seeking interim relief pursuant to FED.R.BANKR.P. 4001(b)(2) and L.B.R. 2081-1.

Therefore, the Debtor filed the Interim Use Motion on June 28, 2023; and the Court authorized the Debtor to access and use Cash Collateral on an interim basis on July 5, 2023.

However, final use of the Cash Collateral remained contingent upon the Court approving the Final Use Stipulations; and the UST and HHS timely objected thereto. More specifically, the UST (1) asserted that a proposed order to approve the stipulations separate from the proposed order authorizing final use of Cash Collateral was superfluous; and (2) objected to the proposed final order to the extent (a) replacement liens granted to CDOR and CAN could attach to causes of action under Chapter 5 of the Code and (b) the Debtor sought for representations as to the amounts, validity, and priority of Secured Claims to become binding on any other party as findings of the Court. Similarly, HHS asserted that the Debtor granting a replacement lien on all Post-Petition accounts receivable and authorizing CDOR and CAN Capital the right to seize and sell such Assets of the Estate in the event of default violated anti-assignment provisions promulgated under 42 U.S.C. § 1395u(b)(6) and 42 C.F.R. § 424.80. On July 17, 2023, the Debtor initiated negotiations with the UST and HHS, which culminated in the Debtor filing the *Unopposed Motion for Entry of Revised Order* filed within the Case on August 1, 2023; and the Court entering the Final Cash Collateral Order on August 3, 2023.

**3.2.4.**   **Health Care Ombudsman.** As the Debtor identifies as a "health care business" within the Voluntary Petition, the Court set a hearing to determine whether necessary to appoint a patient care ombudsman pursuant to 11 U.S.C. § 333 and FED.R.BANKR.P. 2007.2. On June 28, 2023, the Debtor filed the *Motion for Entry of Order Finding Appointment of Ombudsman Not Necessary for Protection of Patients* [Dkt. No. 38] to explain the mistaken reliance on non-bankruptcy law defining "Health-care provider" to include a chiropractic practice instead of the definition of "health care business" under 11 U.S.C. § 101(27A). Pursuant to the oral findings and conclusions made on the record, the Court "declined to make a finding as to whether the Debtor is a 'healthcare business'…" Dkt. No. 45. Nonetheless, the Court rationalized that "the appointment of a patient care ombudsman is not necessary under the specific circumstances of the case" and granted the Ombudsman Motion. Dkt. No. 47.

**3.2.5.**   **Relief from the Automatic Stay.** Among the efforts to formulate the interim and final budgets attached to the Interim Use Motion, the Debtor completed a cost-benefit analysis of retaining and compensating a new medical director in the amount(s) demanded by the then-current applicants and found that compromising on the compensation demanded by such potential medical directors to enable use of the Restrictive Devices for performing Aesthetic Services would lead to the same cash flow issues that caused the filing of this Case. Therefore, the Debtor concluded that marketing the Restricted Devices for sale at a price equal to the balance of the applicable Claims would serve the best interests of the Estate.

Upon requesting whether the Debtor intended to retain the EMFace on July 31, 2023, the Debtor proposed that the parties stipulate to the Court granting NEC relief from the automatic stay to repossess the Collateral if the Debtor was unable to find a suitable buyer on or before a date certain. However, NEC preferred to take possession of the Collateral. On August 15, 2023, the Debtor agreed to surrender the Collateral based upon NEC representing that MMP located a buyer willing to purchase the EMFace for an amount equal to "less than a $10,000 deficiency;" and the parties executed the Agreement for Stay Relief and Other Matters on September 5, 2023, which the Debtor attached to the *Motion to Approve Agreement to Relief from Automatic Stay By and Between Debtor and NEC…* filed on September 15, 2023. As no creditors or interested parties objected to

such motion, the Court entered an *Order Granting Relief from Automatic Stay to NEC…* on October 6, 2023 and NEC retrieved the EMFace from the Pueblo Office on December 7, 2023. Notwithstanding the Debtor investigating any remedies to arise from reliance on NEC's August 2, 2023 representations and the ongoing obligation to present proof of a Deficiency within an amended Proof of Claim, NEC shall hold an Estimated Unsecured Claim in the amount of $60,000.00 for the purpose of voting on this Plan pursuant to representations within an *Objection to Confirmation of First Amended Plan of Reorganization* filed on January 3, 2024.

Similarly, in response to a request received on July 31, 2023, the Debtor and Dext stipulated to the Court granting Dext relief from the automatic stay to repossess the Splendor X if unable to find a suitable buyer on or before September 6, 2023. Although marketing the Collateral for sale, the Debtor received written offer worthy of presenting to Dext for approval and entered into an Agreement to Relief from Automatic Stay with Dext on October 17, 2023, which the Debtor attached to a *Motion to Approve Agreement to Relief from Automatic Stay By and Between Debtor and Dext…* filed on October 19, 2023. As no creditors or interested parties objected to such motion, the Court entered an *Order Granting Relief from Automatic Stay to Dext…* on November 8, 2023 and the Debtor surrendered the Splendor X to Dext on or about December 4, 2023. However, the Debtor has received no further information on whether Dext has sold the Splendor X and, if so, whether a Deficiency remains. Therefore, the Debtor shall calculate Dext's Estimated Unsecured Claim pursuant to the valuation of the Collateral set forth within Claim No. 13.

Furthermore, Pawnee filed a *Motion for Relief from Automatic Stay* on November 13, 2023 in lieu of seeking for the Debtor to surrender the NEO+Exilis and/or EMSella pursuant to terms similar to the provisions of the agreements with NEC and Dext. However, further efforts to obtain relief from the automatic stay would require restarting the process promulgated under L.B.R. 4001-1(a) as Pawnee neither corrected the *Amended Notice of Hearing* in accordance with the *Notice of Electronic Filing Error* issued on November 14, 2023 nor cured the deficiencies described within the *Compliance Order Regarding Motion for Relief from Stay* entered on November 17, 2023. Nonetheless, the Debtor anticipates stipulating to relief from stay and surrender of the NEO+Exilis as such Restricted Devices are not necessary for an effective reorganization.

    **3.2.6.** **Post-Petition Financial Condition.** The Debtor maintains a duty to file periodic financial reports regarding the "profitability" of ongoing operations and has complied therewith by filing MORs for the period of the Petition Date through January 31, 2024. Such MORs demonstrate an average monthly Net Cash Flow of $11,192.00 from June 7, 2023 through January 31, 2024, deriving from such Cash Receipts and Cash Disbursements as follows:

| Month | Receipts | Disbursements | Net Cash Flow |
|---|---|---|---|
| June 7-30, 2023 | $ 30,491.30 | $ 6,778.57 | $ 23,712.73 |
| August 2023 | $ 89,241.53 | $ 65,334.47 | $ 23,907.06 |
| September 2023 | $ 59,756.72 | $ 53,341.70 | $ 6,415.02 |
| October 2023 | $ 79,580.39 | $ 64,160.82 | $ 15,419.57 |
| November 2023 | $ 68,531.36 | $ 53,394.78 | $ 15,136.58 |
| December 2023 | $ 61,205.82 | $ 54,547.32 | $ 6,658.50 |
| January 2024 | $ 62,027.25 | $ 59,002.81 | $ 3,024.44 |
| **Jun 2023 – Jan 2024 Total** | **$ 507,913.97** | **$ 405,857.06** | **$ 102,056.74** |
| **Monthly Average** | **$ 63,489.25** | **$ 50,748.06** | **$ 12,741.19** |

As compared to the average Net Cash Flow for the same periods within the 3-years preceding the Petition Date, the MORs demonstrate that the Debtor has reduced Net Expenses by twenty-six percent (26.46%). Furthermore**,** the the Post-Petition Depository Accounts maintained the collective sum of $ 102,543.09 as of January 31, 2024, arising from an average monthly Net Cash Flow of $12,741.19.[4] Conversely, the Debtor controlled the sum of $481.35 within Depository Accounts on the Petition Date. By generating a Post-Petition Net Income of $102,056.74, the Debtor has realized. Therefore, the Debtor is retaining sufficient Disposable Income to fund Plan Payments by expending only what is reasonably necessary.

    **3.2.7.**   **Claims Objections.** Prior to the expiration of the Claims Bar Date, twelve (12) creditors filed Proofs of Claim against the Estate. Among the thirteen (13) Proofs of Claim timely filed, NEC filed Proof of Claim No. 8 on August 3, 2023 as amended on August 16, 2023, which is duplicative of Proof of Claim No. 2 filed on July 5, 2023 as amended on August 16, 2023. Furthermore, HHS, Pawnee, and BFG filed Late Claims. Therefore, the total of Claims against the Estate – including Claims Scheduled as undisputed, not contingent, and liquidated for which no Proof of Claim was filed – is the sum of $1,473,280.21.

Except to the extent the Court has already deemed a Claim Allowed within a Final Order, the Debtor reserves the right, power, and authority to investigate and, if necessary, object to Claims on or before the Claims Objection Deadline or such other date set by the Court. As the Debtor continues to investigate whether a valid basis exists to object to any Claim(s) balanced against the cost of pursuing any such foreseeable contested matter(s), the Claims Analysis presents an Estimated amount that Holders of Allowed Claims may receive based on foreseeable objections to Claims. Therefore, even if a Claim is Allowed for voting purposes, Claimants may remain subject to an objection by the Debtor and denied any right to a Distribution under a Final Order.

The Debtor anticipates seeking for the Court to reduce or Disallow such Claims, as follows:

    **3.2.7.1.** **NEC Financial Services, LLC.** Pursuant to Claim Nos. 2 and 8, NEC asserts to hold 2 separate but identical Secured Claims in the amount of $125,000.00. Although the Debtor has notified NEC of the duplicative Claim and has requested remediation thereof, NEC has yet to file a notice of withdrawal of either Proof of Claim. Therefore, the Debtor hereby reserves the right to seek for the Court to Disallow Claim No. 8, pursuant to 11 U.S.C. § 502(b)(1).

    **3.2.7.2.** **Pawnee Leasing Corporation.** Pursuant to Late Claim No. 16, Pawnee asserts to hold a Claim in the amount of $53,462.23, of which the sum of $8,500.00 is Secured against the EMSella. However, Conversely, the Debtor Schedules the Claim for the amount of $52,495.22 and the EMSella to maintain a value of $32,470.85. As Pawnee did not move to extend the Claims Objection Deadline, hereby reserves the right to seek for the Court to Disallow Claim No. 16, pursuant to 11 U.S.C. §§ 502(b)(9), should Pawnee vote to reject the Plan.

**3.3.**   **Description of Assets.** The Schedules disclose all real and personal property that the Debtor maintained an equitable or legal interest as of the Petition Date, apart from the Causes of Action discussed within Section 3.3.2 *infra*. Post-Petition, the Debtor used accounts receivable to pay for expenses incurred in the ordinary course in accordance with the Final Cash Collateral Order, surrendered the EMFace to NEC, and surrendered the Splendor X to Dext.

---

[4]   The "Beginning Balance" within the Disposable Income Projections mirrors the "Ending Balance" for the Operating Account and Reserve Account as of January 31, 2024. *Cf.* Dkt. No. 154, pp.5-6.

**3.3.1.** **Tangible Assets.** Notwithstanding a valuation within this Plan to the contrary, the Debtor valued, on the Petition Date, such Assets existing as of the date hereof, as follows:

| Asset | Fair Market Value | Valuation Basis |
|---|---|---|
| Accounts Receivable | $ 214,762.33 | Collectible Accounts |
| Body Scanner Software and Computer | $ 4,000.00 | Comparable Sales |
| Cellutone | $ 9,666.00 | Comparable Sales |
| X-Ray Machine | $ 26,825.00 | Double Declining Depreciation |
| EMSculpt | $ 60,347.50 | Double Declining Depreciation |
| EMSculpt NEO | $ 184,999.50 | Double Declining Depreciation |
| EMSella Chair | $ 32,470.85 | Double Declining Depreciation |
| EMTone | $ 134,262.18 | Proof of Claim No. 10 |
| Erchonia Lasers | $ 19,640.00 | Double Declining Depreciation |
| Exilis | $ 28,825.00 | Double Declining Depreciation |
| Finished Goods as of December 31, 2023 | $ 787.50 | Wholesale |
| Inventory as of December 31, 2023 | $ 1,794.00 | Wholesale |
| Office Equipment | $ 285.50 | Comparable Sales |
| Office Furniture | $ 4,522.00 | Comparable Sales |
| Traction/Decompression System | $ 1,000.00 | Comparable Sales |
| **Total** | **$ 724,187.36** | |

However, ninety-eight percent (98.29%) of the Assets are subject to Liens and/or inoperable without the Debtor employing a licensed medical doctor.

**3.3.2.** **Investigation of Causes of Action.** Prior to the date hereof, the Debtor investigated all transactions and occurrences arising within the four (4) years preceding the Petition Date to uncover any Causes of Action including, but not limited to, preference payments and fraudulent conveyances that the Debtor and/or Estate may avoid and recover under the Code and/or applicable state law. Upon weighing the additional costs of litigation and the likelihood of an adverse judgment, the Debtor may pursue Causes of Action against such Persons or Entities, as follows:

**3.3.2.1.** **BTL Industries, Inc.** As BTL knew that Mr. Davis maintains a license in chiropractics, and not a medical doctor, when selling the Restricted Devices to the Debtor; the FDA deems such sales as misbranded and disallowed pursuant to 21 C.F.R. § 801.09 and 21 U.S.C. § 352(q). Therefore, the Debtor is weighing the costs and benefits of pursuing rescission of the agreements for the purchase of the Cellutone, EMFace, EMSculpt NEO, EMTone, and Exilis Ultra based on causes of action for breach of contract, fraud, fraudulent misrepresentation, and any private right of action arising under Title 21 of the United States Code or COLO.REV.STAT. 12-240-101, *et seq*; and hereby respectfully reserves the right to pursue any and all causes of action against BTL for the benefit of the Estate. Nonetheless, the Debtor shall Distribute Plan Payments to NEC, NMEF, Amur, and Pawnee as Holders of Class 5 Claims unless paid in full by BTL upon the Debtor successfully rescinding the purchase agreements.

**3.3.2.2.** **Lumenis BE Inc.** Analogous to the facts surrounding the sales of Restricted Devices by BTL, the Debtor hereby respectfully reserves the right to pursue causes of action against Lumenis arising from the purchase and sale of the Splendor X Package on or about September 27, 2022 as Lumenis knowingly sold such Restricted Device(s) to a chiropractor.

Nonetheless, the Debtor shall Distribute Plan Payments to Dext as the Holder of a Class 5 Claim unless paid in full by Lumenis upon the Debtor successfully rescinding the purchase agreement.

**3.3.2.3. Vigil and Alford, LLC.** The Debtor rendered Chiropractic Services to automobile accident victims represented by Vigil and Alford, LLC within civil actions for claims arising under the underinsured motorist protection statutes commenced before the El Paso County and Pueblo County, Colorado District Court(s) in the amount of $66,256.17 from April 11, 2018 up to and through October 7, 2019. Pursuant to public records maintained by the Integrated Colorado Courts E-Filing System, Vigil and Alford commenced civil actions on behalf of such victims between July 13, 2020 and October 26, 2021 and all such lawsuits were fully adjudicated prior to the Petition Date. Pursuant to COLO.REV.STAT. 38-27.5-101, *et seq.*, the Debtor is the holder of a health-care provider lien against any funds awarded to an injured person for usual and customary billed charges arising from Chiropractic Services rendered. However, Vigil and Alford has failed to compensate the Debtor as representing that the civil actions remain open and pending settlement. Therefore, the Debtor may pursue, and hereby preserves, causes of action for breach of fiduciary duty, civil theft, and violation of the Health-Care Provider Liens statutes under article 27.5 of Title 38 of the Colorado Revised Statutes against Vigil and Alford to collect the amount of $66,256.17 due and owing for past services rendered.

**3.3.2.4. Wolf & Key LLC.** The Debtor tendered the sum of $79,225.00 to Wolf & Key LLC from January 20, 2020 through March 1, 2023 in accordance with an agreement for marketing and advertising services including, but not limited to, increasing the Debtor's social media presence, creating print media for Aesthetic Services, and developing an interactive website. On or about March 1, 2023, the Debtor terminated the contract due to Wolf & Key failing to perform services within the time constraints and according to the quality metrics enumerated within the parties' agreement. Although the Debtor paid for all services contemplated under the contract, Wolf & Key claims to have "lost" the Debtor's interactive website, has withheld access to digital media content created, and failed to commence or complete the development of additional marketing and advertising materials. Nonetheless, the Debtor acknowledges that Wolf & Key did render some compensable services and an apportionment analysis to determine the amount of the Debtor's damages remains ongoing. However, documents and records readily available to the Debtor demonstrate that Wolf & Key applied the sum of $19,800.00 towards services either never rendered or to develop the inaccessible website, which is the sum reflected within the Liquidation Analysis. Therefore, the Debtor hereby preserves the right to pursue Causes of Action against Wolf & Key for damages in an amount to be determined upon completing a full review of all information readily available to the Debtor.

**3.4. Statutory Requirements for Confirmation.** The Court may find that the Plan complies with the requirements promulgated under 11 U.S.C. § 1190, as follows:

**3.4.1. Liquidation Analysis.** As a condition precedent to confirmation, the Plan must pass muster under the "best interests" of creditors test, which requires the Court to find that all Claimants and Interest Holders who do not vote in favor of the Plan shall receive at least the amount that such Holder would receive if the Debtor liquidated under Chapter 7 of the Code as beginning on what would have been the Effective Date.

The Liquidation Analysis attached hereto assumes that: (1) the Debtor would cease to operate; (2) the UST would appoint a Chapter 7 Trustee to sell, abandon, surrender, or otherwise liquidate substantially all of the Assets; (3) the Chapter 7 Trustee would collect and convert the Assets as

expeditiously as is compatible with the best interests of parties in interest; (4) the Chapter 7 Estate would incur costs to liquidate the Assets; and (5) Claimants are paid out of proceeds generated from liquidation of unencumbered Assets and the proceeds of encumbered Assets in excess of the Secured Claim in accordance with priorities established under 11 U.S.C. § 726. As applicable hereto, the proceeds recovered from selling any Restricted Devices and Chiropractic Equipment, regardless of whether fully encumbered by Secured Claims, shall be subject to a "Recertification Fee" charged by BTL in such amounts reflected within the Liquidation Analysis.[5] Therefore, the proceeds from a liquidation of the Assets following payment of the Recertification Fee to BTL would leave no Distribution to Unsecured Claimants. Furthermore, a Chapter 7 Trustee lacking Mr. Davis's experience, expertise, and personal relationships with patients and personal injury attorneys shall negatively affect the collectability of accounts receivables by no less than forty-seven percent (47.33%), based on such assumptions as follows: (1) the expeditious nature of a Chapter 7 case conflicts with the customary time frame between Chiropractic Services rendered and compensation received from automobile injury patients, which would lead to the Chapter 7 Trustee abandoning no less than 50.0% of such receivables unless willing to keep the estate open for 2 to 3 years; (2) inexperience with the procedures to overcome the laborious hurdles associated with the approximately seventeen percent (17.34%) of insurance claims that requires the Debtor to appeal the insurer's decision of non-coverage prior to collecting payment; (3) the Chapter 7 Trustee may be able to convince one-third (33.33%) of the eighty (80) cash patients that routinely pay invoices for the last treatment during their return visit to tender payment without the need to pursue collection actions or retain a collection specialist; and (4) the cost to actively pursue collection efforts and/or prosecute any civil action against the remaining cash patients outweighs the benefit of the amounts available to collect from each Person. Therefore, the sum of accounts receivables that the Debtor expects to collect after the Effective Date, and applies to the Disposable Income Projections, is fifty-three percent (52.66%) greater than the projected portion collectible by a Person or Entity other than the Debtor, as demonstrated by such analysis as follows:

| Account Type | Total Outstanding | Debtor Collections | | Chapter 7 Trustee Collections | |
|---|---|---|---|---|---|
| | | Return Rate | Amount | Return Rate | Amount |
| Automobile | $ 562,830.67 | 44.15% | $ 248,477.26 | 22.07% | $ 124,238.63 |
| Cash/Out-of-Pocket | $ 13,430.24 | 68.15% | $ 9,152.26 | 22.72% | $ 3,050.75 |
| Govt. Policies | $ 29,084.85 | 45.76% | $ 13,309.57 | 45.76% | $ 13,309.57 |
| Private Insurance | $ 17,960.35 | 71.10% | $ 12,769.98 | 53.76% | $ 9,665.57 |
| **Total** | **$ 623,306.11** | **45.91%** | **$ 283,709.06** | **24.18%** | **$ 150,254.52** |

By applying the above assumptions and analysis, the Liquidation Analysis demonstrates that a hypothetical liquidation of the Estate under Chapter 7 of the Code would generate no Cash (i.e. $0.00) to Distribute Holders of Allowed Unsecured Claims.[6] Conversely, the Plan provides for full satisfaction of Administrative Expenses, Priority Taxes, and Secured Claims, to the extent Allowed; and, if Plan Payments follow a Consensual Confirmation, consistent annual Distributions to Holders of Allowed Unsecured Claims over the Plan Term. Therefore, the Liquidation Analysis

---

[5]   Alex R. Thiersch, *Negotiating Laser Contracts*, Modern Aesthetics, Jul.–Aug. 2017, https://assets.bmctoday.net /modernaesthetics/pdfs/MA0817_ES_Laser.pdf.

[6]   *Cf. e.g. In re Mtn. Glacier LLC*, 564 B.R. 314, 318 (Bankr.M.D.Tenn.2017) ("Since the Debtor is a service company, there is very little value…").

demonstrates confirmation of the Plan is in the best interests of all Claimants and Interest Holders as affording the highest rate of recovery to every Class of Claims.

**3.4.2.** **Disposable Income ("Best Efforts") Test.** As a condition precedent to a Cramdown Confirmation, the Court must also find that the Plan Payments during the Plan Term is not less than the "projected disposable income" pursuant to 11 U.S.C. § 1190(c)(2).

Since the Debtor foresees no material changes to ordinary expenses or the need to incur additional costs to replace furniture, fixtures, or equipment, the Debtor proposes a 3-year Plan Term as reflected in the Disposable Income Projections, which derives from Profit and Loss Statements for February through May of the 3-years immediately preceding the Petition Date and an annualized calculation of Net Cash Flows within the MORs. Alternatively, Disposable Income Projections deriving exclusively from historical operations would not account for the Debtor either ceasing to offer Aesthetic Services or eliminating unnecessary expenses since the Petition Date; and calculating Disposable Income solely based on Post-Petition operations would fail to account for Cash Receipts and volatile expenses during the months not subject to the Case. Furthermore, the Debtor adjusts for growth at rates reported by the U.S. Small Business Administration and the Western Blue Chip Economic Forecast as of January 19, 2024, inflation rates within the Consumer Price Index as of January 12, 2024, and the anticipated cost to prosecute Causes of Action identified within Section 3.3.2 *supra*.

Pursuant to such analysis and assumptions, Unsecured Claimants shall recover a Pro-Rata Share of $54,000.00 – approximately five cents on the dollar (i.e. 5.07%) – if Plan Payments follow a Consensual Confirmation; or a Pro-Rata Share of $17,782.58 – approximately two cents on the dollar (i.e. 1.67%) – if Distributions follow a Cramdown Confirmation. Although Distributions following a Cramdown Confirmation shall satisfy 11 U.S.C. §§ 1190(2) and 1191(c)(2) as the Debtor commits to applying all post-Effective Date projected Disposable Income towards Plan Payments of an amount to exceed the Pro-Rata Share recovered under Chapter 7, Plan Payments to Unsecured Claimants under such circumstances shall not arise until Year 3. Furthermore Class 5 Claimants voting to reject the Plan are electing to gamble on, and share in, the trials and tribulations of the Debtor during the Plan Term as the Claim Treatment may be reduced, upon the Court finding that modification is warranted and satisfies the requirements of 11 U.S.C. § 1191, if unforeseeable circumstances render the Plan unworkable. Conversely, the Debtor shall Distribute twice the amount of Cash to Unsecured Claimants under a Consensual Confirmation by applying the Administrative Expense payable to the Trustee as Disbursing Agent towards Distributions and prioritizing Plan Payments to Class 5 Claimants over one monthly paycheck owing to Mr. Davis. Therefore, the consistent, reliable, and larger sum of Plan Payments to follow a Consensual Confirmation is in the best interest of creditors.

**3.4.3.** **Feasibility.** Regardless of whether any Class of Impaired Claims votes to accept or reject the Plan, the Court must find a reasonable likelihood of the Debtor funding the Plan Payments and confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtor unless otherwise contemplated by the Plan.[7] Herein, the MORs demonstrate that the Debtor can satisfy the Plan Payments by continuing to operate

---

[7]   *FB Acquisition Property I, LLC v. Gentry (In re Gentry)*, 807 F.3d 1222 (10th Cir.2015)("feasible plan is not a guarantee of success but rather offers a reasonable assurance of success").

throughout the Plan Term. Therefore, the Court may find that the current financial trajectory of the Debtor against its historical condition provides reasonable assurance that the Plan is viable.

### 3.4.3.1. __Safeguards Against Repetition of Pre-Petition Conduct.__ The Debtor has also implemented policies and procedures to safeguard against any repeat of the historical events leading to this Case, as follows:

Post-Petition, the Debtor has focused on generating positive Net Income by limiting Net Expenses to such costs incurred in the ordinary course and necessary for continued operations; and the procedures implemented to evaluate Net Expenses to reduce and to ensure future operations remain subject to such analysis includes, but is not limited to: (1) remeding 6-years of inconsistent bookkeeping arising from office manager turnover; (2) ceasing all operations arising under, related to, or associated with Aesthetic Services; and (3) prioritizing monthly expenses to prevent any possibility of becoming overleveraged by simultaneously attempting to meet all expenses without consideration of cash flows and Net Income during such period.

More specifically, the Debtor employed one office manager from the Formation Date through October 19, 2020 due to her experience and expertise in use of treatment codings within electronic health record ("__EHR__") systems, preparing billing statements, and maintaining contempraeous records of accounts receivable, accounts payable, Cash Receipts subject to contractual and statutory discounts, and Net Expenses. However, such office manager resigned on October 19, 2020 as the unemployment payments collected during COVID-19 exceeded her weekly paychecks. Furthermore, she neither afforded the Debtor notice of her resignation nor assisted in training her replacement. Thereinafter, from November 1, 2020 through July 16, 2022, the Debtor hired and terminated 3 separate office managers due to their inability to comprehend EHR systems, comply with health care billing practices, or manage the ordinary day-to-day operations. On July 17, 2022, the current office manager initiated an audit of the accounts receivable to discover any payments collected but not properly applied in and throughout 2021, and such efforts remain ongoing. Since January 1, 2020, the Debtor has also employed sixteen (16) employees to assist with office administration tasks but their duties have involved scheduling appointments, greeting visitors, and accepting payments, among other forms of customer service; and such employees – including the 3 currently employed by the Debtor – had never received training on inputting data into the EHR or bookkeeping systems maintained by the Debtor. Therefore, accurate financial records were not available on the Petition Date to compute the value of accounts receivable or to prepare a job costing analysis on Chiropractic Equipment versus Restricted Devices.

Post-Petition, the Debtor completed a thorough review of the aging accounts receivable reported within the EHR system to formulate the accurate portion available to collect by comparing such aging reports against Depository Account records, explanations of benefits, and monthly transaction reports maintained within the EHR system to determine whether any obligatory discounts were not applied, payments collected were not inputted, or billing statements were not sent to the proper insurance companies and have since became time-barred. Furthermore, concerns with history repeating itself if the current office manager resigns, which the Debtor foresaw as imminent due to her increased voicing of frustrations and stress associated with the need to juggle continued efforts to audit historical affairs, manage day-to-day operations, and maintain contemporaneous records of current operations in furtherance of the newly rectified accounts receivable aging details led to the Debtor training the remaining office employees on the practices and procedures for using the EHR and bookkeeping systems by and through training seminars and

updating the employee handbook to include practices, procedures, and detailed manuals on issuing billing statements and inputting payments collected with specific instructions for separate classes of payors Therefore, the Debtor now maintains a true and accurate record of collectible accounts receivables and has implemented procedures to prevent a repeat of the events leading to this Case.

## IV.    SUMMARY AND OVERVIEW OF PLAN

**4.1.    General Compromise of Claims.** Pursuant to 11 U.S.C. §§ 1123 and 1190, and in consideration for the classification, Distributions, and other benefits provided under the Plan, (1) the provisions of the Plan shall constitute a good faith compromise of all Claims, Causes of Action, and controversies related to the rights that a Claimant or Interest Holder may have against the Debtor and/or the Estate with respect to any Claim or Interest, or any Distribution(s) on account thereof; and (2) the confirmation of the Plan shall constitute (a) modification of any obligation for which Treatment is provided under the Plan; (b) cure of any obligation previously in default so modified as of the Confirmation Date; (c) approval of the Distributions made to Holders of Allowed Claims as fair, equitable, reasonable, and good-faith compromises to all such Claims, Causes of Action, and controversies in the best interests of Claimants, Interest Holders, the Debtor, and the Estate; and (d) a finding that the remedies afforded to Claimants and Interest Holders in the Event of Default constitutes adequate protection in accordance with 11 U.S.C. § 1191(c)(3)(B).

**4.2.    Summary of Classification and Treatment.** Notwithstanding Treatment of Unclassified Claims under Article V *supa*, all Allowed, Disputed, and/or Estimated Claims and Interests are classified in a particular Class for the purpose of voting on the Plan and, to the extent such Claim is Allowed, receiving Distributions;[8] and classified in other Classes to the extent that any portion of the Claim qualifies within the description of such other Classes, as follows:

| Num | Class | Claimant | Status | Voting Class | Treatment |
|---|---|---|---|---|---|
| -- | -- | Administrative Expenses | Unimpaired | NO | Full Recovery 30-days of Allowed; or per consensual terms. |
| | | Tax Claims | | | |
| 1 | Priority | Allowed General Claims | Unimpaired | NO | Vacant and Eliminated. |
| 2-1 | Secured | CDOR | Impaired | YES | Full recovery amortized over Plan Term. |
| 2-2 | | CAN | | | |
| 3-1 | Secured | Amur | Impaired | YES | Surrender Collateral and pay Deficiency, if any, under Class 5. |
| 3-2 | | Dext | | | |
| 3-3 | | NEC | | | |
| 3-4 | | NMEF | | | |
| 3-5 | | Pawnee Loan No. 5198 | | | |
| 4-1 | Secured | BFG | Impaired | YES | Pay Collateral value amortized over Plan Term and Deficiency under Class 5. |
| 4-2 | | Pawnee Loan No. 8254 | | | |
| 4-3 | | Stearns Loan. No. 3001 | | | |
| 4-4 | | Stearns Loan. No. 3003 | | | |
| 5 | Unsecured | Allowed General Claims | Impaired | YES | Distribute Pro-Rata Disposable Income over Plan Term. |
| 6 | Equity | Equity Interests | Unimpaired | NO | Retain Interest(s). |

---

[8]    Claimants should refer to Article VI *infra* and the Claims Analysis for further information on Treatment of Claims. Holders of Secured Claims should also refer to 11 U.S.C. § 506(a), which governs bifurcation of a Claim.

## V.    TREATMENT OF UNCLASSIFIED CLAIMS

The Debtor shall treat Unclassified Claims against the Estate, as follows:

**5.1.    Administrative Expenses.** As consideration for full and final satisfaction, settlement, release, and discharge of each Claim, to the extent Allowed under 11 U.S.C. § 503, Claimants shall recover Cash payment equal to the full amount of their Allowed Claim either within 30-days after Allowed by a Final Order or (2) upon such other terms mutually agreed upon by the Claimant and the Debtor; and the Debtor shall remain current with post-Effective Date obligations in accordance with the terms thereof; on account of such Administrative Expenses, as follows:

| Claimant | Amount Owed |
|---|---|
| Post-Petition Ordinary Course of Business Expenses | $          0.00 |
| Post-Petition Tax Liability | $          0.00 |
| Estimated Professional Fees of Accountant: Karen E. Heerschap, CPA | $     5,000.00 |
| Estimated Professional Fees of Trustee: Mark D. Dennis, CPA | $     5,000.00 |
| Estimated Professional Fees of Counsel: Joshua B. Sheade, Esq. | $    90,000.00 |
| **TOTAL** | **$   100,000.00** |

**5.2.    Priority Tax Claims.** As consideration for full and final satisfaction, settlement, release, and discharge of Claims, to the extent Allowed under 11 U.S.C. § 507, the Debtor shall pay in full on, or as soon as practicable after, the Effective Date, such Governmental Units as follows:

| Claimant | Amount Owed |
|---|---|
| Internal Revenue Service | $         70.92 |
| Colorado Department of Public Health and Environment | $         58.00 |
| Pueblo, Colorado Finance Department, Sales Tax Division | $        100.00 |
| **TOTAL** | **$        228.92** |

## VI.    TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

The Debtor places each Claim and Interest within the below Classes, and provides a brief basis for classification, the Treatment, and voting rights of each Class. As consideration for full and final satisfaction, settlement, release, and discharge of Allowed Claims under 11 U.S.C. §§ 502 and 506, the Debtor shall treat each Class of Claims and Interests, as follows:

**6.1.    Class 1: General Priority Claims.** Class 1 consists of Priority Claims – other than Administrative Expenses and Priority Taxes – to the extent Allowed and entitled to specific treatment under 11 U.S.C. § 507. Although the Debtor is unaware of any such Priority Claims to exist, the Plan includes this Class to provide flexibility should any arise prior to the Effective Date. **Treatment.** Any Class 1 Claim made known in the future, to the extent Allowed under 11 U.S.C. § 507(a), shall receive payment in full, either: (1) on, or as soon as practicable after, the Effective Date if Allowed prior thereto; (2) thirty (30)-days following allowance of any such Claim pursuant to a Final Order; (3) in accordance with a Final Order; or (4) pursuant to mutually agreed upon terms and conditions by and between the Debtor and a Claimant, if any. **Voting.** Class 1 is a Vacant Class and **Eliminated.**

**6.2.    IMPAIRED Classes Wholly Secured Against Cash Collateral.** Claims Secured against Post-Petition Cash Collateral shall be subject to such terms and rights, as follows: **(1) Claim**

**Treatment.** The Debtor shall satisfy (a) the Secured Claim in full by Distributing (i) thirty-six (36) equal monthly installments commencing on the Effective Date, together with interest accruing as of the Petition Date, and (ii) any remaining unpaid principal or interest within 30-days following the third (3rd) Anniversary; and (b) shall treat the Allowed Unsecured Claim, if any, under Class 5. **(2)** **Lien Treatment.** Claimants shall retain a Lien against the same Assets of the Estate and with the same priority as existed on the Petition Date, pending payment in full of the Allowed Secured Claim. **(3)** **Voting.** Each Class is **IMPAIRED and an Eligible Voter**. **(4)** **Classification and Distributions.** The separate Classes shall be treated, follows:

6.2.1. **Class 2-1: Colorado Department of Revenue** arises from wage withholding taxes subject to a 1st priority Lien against all Assets, which CDOR perfected under COLO.REV.STAT. §§ 39-21-114 and 39-22-604. Pursuant to Claim No. 4, the Debtor shall: (1) Distribute monthly installments of $201.34 on account of an **Allowed Secured Claim in the amount of $5,750.00** together with interest accruing at eight percent (8.0%) per annum from the Petition Date through December 31, 2023 and eleven percent (11.0%) per annum from January 1, 2024 through the 3rd Anniversary;[9] and (2) treat the **amount of $1,476.00 as an Allowed Unsecured Claim**.

6.2.2. **Class 2-2: CAN Capital, Inc.** arises from a Security Agreement executed in favor of WebBank on June 2, 2022, as consideration for a loan in the principal amount of $134,174.95 subject to a 2nd priority Lien in Post-Petition Cash Collateral granted to CAM on June 26, 2023 that stems from a Pre-Petition Security Interest CAN perfected by filing a Financing Statement upon WebBank assigning all rights, title, and interest to CAN on or about June 6, 2022. Pursuant to Claim No. 1, the Debtor shall Distribute monthly installments of $3,012.36 on account of the **Allowed Secured Claim in the amount of $106,244.86**, together with interest accruing at the default rate under the Security Agreement of $50.00 per month.

**6.3.** **IMPAIRED Classes Under-Secured Against Restricted Devices.** Claims Secured against Restricted Devices shall be subject to such terms and rights, as follows: **(1)** **Claim Treatment.** The Debtor shall (a) satisfy the Secured Claim in full by surrendering and re-conveying the Estate's interest in the Collateral to the applicable Claimant within 30-days following the Effective Date; and (b) treat the Deficiency Claim, to the extent Allowed, as Unsecured under Class 5. **(2)** **Lien Treatment.** Claimants shall retain a Security Interest against the Collateral with the same priority as existed on the Petition Date, pending payment in full of the Secured Claim, to the extent Allowed. **(3)** **Voting.** Each Class is **IMPAIRED and an Eligible Voter**. **(4)** **Classification and Distributions.** The separate Classes shall be treated, follows:

6.3.1. **Class 3-1: Amur Equipment Finance, Inc** Claim arises from a Security Agreement executed in favor of MMP on August 6, 2022, to finance the Cellutone purchase in the principal amount of $250,000.00; and subject to a 1st priority Security Interest against the Cellutone that Amur perfected by filing a Financing Statement upon MMP assigning all rights, title, and interest to Amur on or about August 9, 2022. Pursuant to Claim No. 9, the Debtor shall treat the Class 3-1 Claimant shall hold an **Estimated Secured Claim in the amount of $9,666.00** and an **Estimated Unsecured Claim for the Deficiency of $273,756.61**.

6.3.2. **Class 3-2: Dext Capital, LLC** arises from a Security Agreement executed in favor of MMP on August 6, 2022, to finance the Splendor X purchase in the principal amount of

---

[9]   COLO.REV.STAT. § 39-21-110.5; *cf.* Ken Boldt, Memorandum: C.R.S. 39-21-110.5 – Rate of Interest to be Fixed (July 3, 2023), https://banking.colorado.gov/public-notices/interest-rates-set-by-the-bank-commissioner.

$162,000.00; and subject to a 1st priority Security Interest against the Splendor X that Dext perfected by filing a Financing Statement upon MMP assigning all rights, title, and interest to Dext on or about August 9, 2022. Pursuant to Claim No. 13, the Class 3-2 Claimant shall hold an **Estimated Secured Claim in the amount of $208,567.51** and an **Estimated Unsecured Claim for the Deficiency of $0.00**.

    **6.3.3.  Class 3-3: NEC Financial Services, LLC** arises from a Security Agreement executed in favor of MMP on February 2, 2023, to finance the EMFace purchase in the principal amount of $99,000.00; and subject to a 1st priority Security Interest against the EMFace as perfected upon MMP assigning all rights, title, and interest to NEC on or about August 9, 2022. Pursuant to Claim No. 2, the Class 3-3 Claimant shall hold an **Estimated Secured Claim in the amount of $63,882.92** and an **Estimated Unsecured Claim for the Deficiency of $60,000.00**.

    **6.3.4.  Class 3-4: North Mill Equipment Finance LLC** arises from a Security Agreement executed in favor of MMP on December 20, 2020, to finance the purchase of the EMTone in the principal amount of $149,000.00; and subject to a 1st priority Security Interest against the EMTone that NMEF perfected upon MMP assigning all rights, title, and interest to NEC on or about January 8, 2021, as amended on February 2, 2023. Pursuant to Claim No. 10, the Class 3-4 Claimant shall hold an **Estimated Secured Claim in the amount of $134,262.18** and an **Estimated Unsecured Claim for the Deficiency of $0.00**.

    **6.3.5.  Class 3-5: Pawnee Leasing Corporation Loan No. 8254** arises from a Security Agreement executed in favor of Tandem on December 9, 2021, to finance the NEO+Exilis purchase in the principal sum of $334,814.40; and subject to a 1st priority Security Interest against the Neo+Exilis that Pawnee perfected by filing a Financing Statement upon Tandem assigning all rights, title, and interest to Pawnee on or about December 14, 2021. Pursuant to Late Claim No. 15, the Class 3-5 Claimant shall hold an **Estimated Secured Claim in the amount of $67,000.00** and an **Estimated Unsecured Claim for the Deficiency of $188,350.84**.

**6.4.  IMPAIRED Classes Under-Secured Against Chiropractic Equipment.** Claimants holding a perfected Security Interest against Chiropractic Equipment shall be subject to such terms and rights, as follows: **(1) Claim Treatment.** The Debtor shall (a) satisfy the Secured Claim in full by Distributing (i) 36 equal monthly installments in the amount of the Allowed Secured Claim, together with interest accruing at the Till Rate commencing on the Effective Date and (ii) any remaining unpaid principal or interest within 30-days following the 3rd Anniversary; and (b) treat the Deficiency as an Allowed Unsecured Claim under Class 5. **(2) Lien Treatment.** Claimants shall retain a Security Interest against the Collateral with the same priority as existed on the Petition Date, pending payment in full of the Allowed Secured Claim. **(3) Voting.** Each Class is **IMPAIRED and an Eligible Voter**. **(4) Classification and Distributions.** The separate Classes shall be treated, follows:

    **6.4.1.  Class 4-1: BFG Corporation** arises from a Security Agreement executed in favor of DLL, effective September 25, 2020, to finance the purchase of the X-Ray Machine in exchange for principal and interest in the sum of $66,544.00; subject to a 1st priority Security Interest in the X-Ray Machine that DLL perfected by filing a Financing Statement on October 2, 2020 and DLL assigning all rights, title, and interest to BFG on February 25, 2021. Pursuant to Late Claim No. 17, which mirrors the Schedules, the Debtor shall: (1) Distribute to the Class 4-1 Claimant monthly installments of $828.28 on account of the **Allowed Secured Claim in the amount of $26,825.00**; and (2) treat the **Deficiency of $1,462.72 as an Allowed Unsecured Claim**.

**6.4.2.** **Class 4-2: Pawnee Leasing Corporation Loan No. 5198** arises from a Security Agreement executed in favor of Tandem on March 19, 2020, to finance the purchase of the EMSella in the original principal sum of $80,000.00; subject to a 1st priority Security Interest against the EMSella that Pawnee perfected by filing a Financing Statement upon Tandem assigning all rights, title, and interest to Pawnee on or about March 20, 2020. Pursuant to Late Claim No. 16 and the Debtor valuing the EMSella based on double declining depreciation over a seven (7) year recovery period, the Debtor shall: (1) Distribute to the Class 4-2 Claimant monthly installments of $1,002.61 on account of the **Allowed Secured Claim in the amount of $32,470.85**; and (2) treat the **Deficiency of $20,991.38 as an Allowed Unsecured Claim**.

**6.4.3.** **Class 4-3: Stearns Bank, N.A. Loan. No. 3001** arises from a Security Agreement executed in favor of Stearns on October 3, 2018, to finance the purchase of the Lasers in the principal sum of $94,795.00; subject to a 1st priority Security Interest against the Lasers that Stearns perfected by filing a Financing Statement on November 30, 2018. Pursuant to Claim No. 12, the Debtor shall: (1) Distribute to the Class 4-3 Claimant monthly installments of $606.43 on account of the **Allowed Secured Claim in the amount of $19,640.00**; and (2) treat the **Deficiency of $6,246.37 as an Allowed Unsecured Claim**.

**6.4.4.** **Class 4-4: Stearns Bank, N.A. Loan. No. 3003** arises from a Security Agreement executed in favor of Stearns on August 27, 2019, to finance the purchase of the EMSculpt in the principal sum of $179,000.00; subject to a 1st priority Security Interest against the EMSculpt that Stearns perfected by filing a Financing Statement on August 29, 2019. Pursuant to Claim No. 12, the Debtor shall: (1) Distribute to the Class 4-4 Claimant monthly installments of $1,863.36 on account of the **Allowed Secured Claim in the amount of $60,347.50**; and (2) treat the **Deficiency of $49,455.45 as an Allowed Unsecured Claim**.

**6.5.** **Class 5: Allowed Unsecured Claims.** Class 5 consists of Unsecured Claims, to the extent Allowed under 11 U.S.C. § 502, which the Claims Analysis identifies as nineteen (19) Claimants of which 13 hold Allowed Claims in the sum of $280,169.94 and 6 hold Estimated Claims in the sum of $784,897.45. For further details on the Estimated Treatment of each Allowed Class 5 Claim, the Debtor refers Claimants to the Claims Analysis. Holders of Allowed Unsecured Claims shall be subject to such terms and rights, as follows: **(1)** **Treatment.** Depending on whether Class 5 Claimants vote to accept or reject the Plan, the Debtor shall treat Allowed Class 5 Claims as follows: **(a)** **Consensual Confirmation.** The Disbursing Agent shall Distribute to Holders of Allowed Unsecured Claims a Pro-Rata Share of $54,000.00 by tendering equal annual Plan Payments within 30 days of each Anniversary following the Effective Date. Pursuant to the Claims Analysis, which remains subject to change depending on allowance of Estimated Deficiency Claims and Rejection Claims, the Debtor projects that Holders of Class 5 Claims shall receive Pro-Rata Distributions of five cents on the dollar (i.e., 5.07%). **(b)** **Cramdown Confirmation.** Pursuant to the totality of Class 5 Claims under the Claims Analysis and the Disposable Income calculated under the Disposable Income Projections, Holders of Allowed Unsecured Claims shall receive Pro-Rata Distributions of two cents on the dollar (i.e., 1.67%) within 30 days after each Anniversary of the Effective Date if following a Cramdown Confirmation. **(2)** **Voting.** Class 5 is **IMPAIRED and entitled to vote to accept or reject the Plan**.

**6.6.** **Class 6: Equity Interests in Center for Alternative Medicine, PLLC.** Class 6 consists of 100.0% of the Interests in the Debtor that Mr. Davis maintained as of the Petition Date, which shall be subject to such terms and rights, as follows: **(1)** **Treatment.** On the Effective Date, Mr.

Davis shall retain all existing rights, privileges, and interest in the Debtor to the fullest extent Allowed, notwithstanding any provisions under this Plan to the contrary. **(2)** **Voting.** Class 6 is **UNIMPAIRED, not permitted to vote, and deemed to accept the Plan.**

## VII.   ALLOWANCE AND DISALLOWANCE OF CLAIMS

Notwithstanding any provision of this Plan, the Confirmation Order, any other Final Order, the Code, or Federal Rules to the contrary, Claims may be subject to such cumulative and non-exclusive conditions and procedures, as follows:

**7.1.   Disputed Claims.** The Disbursing Agent shall not Distribute any Cash under the Plan on account of a Disputed Claim, or such portion thereof, unless and until all objections to the Claim and Causes of Action against the Claimant are resolved or the Claim is Allowed. Certain Claims defined as Disputed under this Plan shall be subject to the following procedures, as follows:

**7.1.1.   Deficiency Claims.** Claimants shall hold, retain, and reserve the right, power, and authority to file a Proof of Claim for the Deficiency of an Allowed Secured Claim, which either amends a previously and timely filed Proof of Claim or otherwise, **on or before and no later than the 1st Anniversary**; and the Debtor reserves the right to object to any such Proof of Claim on or before the applicable Claims Objection Deadline. Claimants shall attach to the Proof of Claim, as a condition precedent to holding an Allowed Deficiency Claim: (1) the bill of sale or such other written instrument or receipt used to record the sale of the Collateral; (2) an accounting itemizing the amount of proceeds from the disposition and the obligations secured by the Security Interest and/or allowed under the Security Agreement segregated by principal, interest, penalties, and type or category of fees, charges, and/or expenses for which the proceeds were applied; and (3) if the proceeds from disposition of the Collateral were applied to Professional Fees incurred on or after the Petition Date, a time detail for such Professional services rendered.

**7.1.2.   Rejection Claims.** Persons or Entities privy to and/or holding an interest a Rejected Contract in accordance with this Plan shall hold, retain, and reserve the right, power, and authority to file a Proof of Claim for the amount of damages resulting from the Debtor rejecting such Executory Contract or Unexpired Lease, which either amends a previously and timely filed Proof of Claim or otherwise, **on or before and no later than 60 days following the Effective Date**; and the Debtor reserves the right to object to any such Proof of Claim on or before the applicable Claims Objection Deadline. To the extent Allowed, the Debtor shall treat a Rejection Claim as an Unsecured Claim under Class 5.

**7.2.   Estimation of Claims.** For the sole and exclusive purpose of classifying Claims under this Plan, and not as a means for a Claimant to hold an Allowed Claim the Debtor may estimate all Disputed Claims, which includes Deficiency Claims, at an amount equal to, as follows: (1) the amount, if any, determined by the Court pursuant to 11 U.S.C. § 502(c); (2) representations made by the Claimant subject to FED.R.BANKR.P. 9011 following the filing of a Proof of Claim; (3) the Claim amount less the value of any Collateral disclosed within the Proof of Claim; (4) the amount within the Schedules if neither the Court estimated the Claim nor the Claimant timely filed a Proof of Claim; or (5) such lesser amount that is agreed to by the Holder of such claim. For the sake of clarity, any Holder of an Estimated Claim must comply with Section(s) 7.1 and/or 7.2, as applicable, as a condition precedent to holding an Allowed Claim.

**7.3.   Retention and Preservation of Claim Objections.** Except as expressly provided in this Plan, the Confirmation Order, or any provision of the Code to the contrary, the Debtor shall hold,

retain, and reserve the exclusive right, power, and authority to: (1) assert any and all rights, Causes of Action, objections, and defenses with respect to any Proof of Claim subject to the Claims Objection Deadline set forth hereunder and the Federal Rules, or an order of the Court extending such deadline; and (2) settle and compromise any and all Disputed Claim(s).

**7.4.    Disallowed Claims.** Notwithstanding any provision to the contrary within this Plan, a Final Order, any other order of the Court, or any extension of a deadline established under this Plan, the failure to timely file and serve a Proof of Claim or application, as applicable, shall result in the CLAIM DEEMED DISALLOWED, THE CLAIMANT FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING OR ENFORCING SUCH CLAIM AGAINST, AS APPLICABLE, THE DEBTOR, THE ESTATE, AND/OR THE ASSETS THEREOF; THE CLAIM BEING FOREVER BARRED, WAIVED, AND RELEASED; AND THE DISBURSING AGENT SHALL DISTRIBUTE PLAN PAYMENTS TO A CLAIMANT OR PURSUANT TO A CLAIM without the need for further action, notice, order, or approval of the Court to such extent, as follows: (1) in the entirety if Disallowed following the Debtor Scheduling the Claim as disputed, contingent, or unliquidated and the Claimant either failing to file a Proof of Claim or filing a Late Claim; (2) any portion of a Late Claim exceeding the amount of the Claim the Debtor Schedules as undisputed, not contingent, and liquidated; or (3) the entirety of an Administrative Expense, Deficiency Claim, Rejection Claim, or any other Claim or Interest that is Estimated under this Plan if Disallowed following the Claimant or Professional failing to timely file a Proof of Claim or application on or before the applicable deadline arising under this Plan.

**7.5.    Amending Claims Following the Confirmation Date.** Unless obtaining prior written consent from the Debtor, the Holder of a Claim arising from a timely-filed Proof of Claim shall not be permitted to amend or modify such Claim following the earlier of the Confirmation Date or expiration of the deadlines imposed under this Plan; and Holders of Allowed Late Claims shall not be permitted to amend or modify such Claim exceeding the Scheduled Claim amount and/or value of the Collateral at any time or in any manner. Any late-filed amendments to a timely-filed Proof of Claim or Allowed Late Claim for which the Debtor provided no prior written consent shall be deemed Disallowed in full without further action, notice, order, or approval of the Court.

**7.6.    Unclaimed Distributions.** If any Distribution is uncashed within ninety (90) days following Distribution or returned as undeliverable, the Disbursing Agent shall Distribute no further Plan Payments to such Claimant unless and until the Claimant notifies the Disbursing Agent of a current address, in a writing signed under penalty of perjury, on or before 180 days following the Distribution, at which time the Disbursing Agent shall tender all withheld Distributions without penalty and/or interest; any uncashed or undeliverable Distributions remaining in the possession, custody, and control of the Disbursing Agent following expiration of such 180-day deadline shall revert and revest in the debtor for the benefit of the estate free and clear of all claims and liens; and the Person or Entity, entitled to receive a payment or Distribution pursuant to this Plan, that fails to negotiate a check, accept a Distribution, or notify the Disbursing Agent of a forwarding address, with respect to such property, SHALL BE DEEMED TO HAVE RELEASED THE DEBTOR AND/OR DISBURSING AGENT, ABANDONED ANY RIGHT TO DISTRIBUTION UNDER THE PLAN, DISCHARGED, AND FOREVER BARRED; notwithstanding any federal or state escheat law to the contrary.

## VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Persons and/or Entities privy to Pre-Petition Executory Contracts and Unexpired Leases shall be

subject to such terms and conditions, as follows:

**8.1.    Assumption and Rejection.** Notwithstanding any provision of this Plan, any Final Order, or a Post-Petition written agreement executed by the Debtor to the contrary; the Confirmation Order shall constitute approval by the Court, pursuant to 11 U.S.C. §§ 365(a) and 1123(b)(2), of the Debtor, on the Confirmation Date, having (1) expressly assumed all Executory Contracts and Unexpired Leases identified as "Assumed / Assigned" within the Treatment column of the Contracts List;[10] (2) having expressly rejected all Executory Contracts and Unexpired Leases identified thereunder as "Rejected" or "Term Ended / Rejected;" and (3) having expressly rejected, to the extent permitted by applicable law, any Executory Contracts or Unexpired Leases not enumerated within the Contracts List.

The filing of a Proof of Claim in accordance with Section 7.1.2 *supra* by the Person or Entity holding an interest in a Rejected Contract shall be a condition precedent to the Debtor treating a Rejection Claim, to the extent Allowed, as an Unsecured Claim under Class 5.

**8.1.1.    Cure of Assumed Contracts.** As consideration for full satisfaction, settlement, release, and discharge of any default under an Assumed Contract that provides for a right to payment by the Debtor, and in exchange for the assumption thereof: (1) the Person or Entity privy to an Assumed Contract shall receive payment in full of all principal necessary to Cure such Assumed Contract within 30-days following the Effective Date; (2) the Debtor shall remain current in accordance with the terms and obligations arising under such Assumed Contract up to and through the earlier of the expiration or termination of the Assumed Contract or entry of the Final Decree; and (3) any Proof of Claim filed or Claim Scheduled on account thereof shall be deemed fully and finally satisfied and Disallowed with prejudice, without further order of the Court or action by any Person, upon the Debtor tendering the Cure amount.

**8.1.2.    Force and Effect of Assumed Contracts.** All Assumed Contracts shall remain in full force and effect for the benefit of, and be enforceable by, the Debtor in accordance with their terms, notwithstanding any provision of the Assumed Contract that prohibits, restricts, conditions, or is deemed breached by such assumption, assignment, or transfer as hereby deemed unenforceable; and all Assumed Contracts the Debtor did not expressly assign to a third-party from the Petition Date through the Effective Date shall re-vest in the Debtor on the Effective Date or, to the extent necessary under any Assumed Contract or the Code, the Debtor is hereby deemed to assign such Assumed Contracts to itself as the "Reorganized Debtor."

**8.2.    Assumption of Medicare Agreements.** Notwithstanding any objection to Confirmation of this Plan raised by HHS and/or CMS to the contrary, the Debtor shall **ASSUME** the "Medicare Part B Enrollment Agreement" and "Medicare Participating Physician or Supplier Agreement" (hereinafter, collectively "***Medicare Agreements***") as Assumed Contracts on the Effective Date **without any further or future action or process pursuant to Section 8.1 *supra***.

Cure for purposes of the Assumed Medicare Agreements shall consist of the agreement by the Debtor to continue participation in the Medicare program in the ordinary course of business, and to be governed by, and subject to, the terms and conditions of its Medicare Agreements and the incorporated Medicare statutes, regulations, policies and procedures, and to remain liable for any debt to HHS and/or CMS as if the Case had not occurred. Such terms and conditions under the

---

[10]    *See* Exh. 5.

Medicare Agreements shall include, but shall not be limited to, the recoupment or recovery by CMS or its contractors of any Medicare overpayments determined to be due from the Debtor, whether related to Pre-Petition or Post-Petition services. In addition, nothing in this Plan or the Confirmation Order shall release, or operate to enjoin, any Claim of CMS against the Debtor or any non-debtor. The assumption and cure of the Medicare Agreements, or any rights or remedies thereunder, shall not be subject in any manner to, or limited in any manner by, any provision of the Code or Rules, including but not limited to any term in this plan or the confirmation order granting security interests to other parties in the Debtor's healthcare accounts receivable. Furthermore, because any amount due shall be collected in the ordinary course, the United States, on behalf of CMS, shall not be required to file any separate Proof of Claim in the Case to collect any amounts due to CMS under the Medicare program, whether a Rejection Claim, Claim to Cure, Administrative Expense, or otherwise. All of CMS's Claims shall be Unimpaired and shall pass through the Case unaffected by the Plan, Confirmation Order, and/or any other order of the Court.

After the Effective Date, any agreements and disputes arising under the Medicare Act, 42 U.S.C. § 1395, *et seq.*, shall be governed exclusively by Medicare statutes, regulations, policies, and procedures, without regard to the Code or Bankruptcy Rules. 42 U.S.C. §§ 405(h), 1395ii. Such limitations include, but are not limited to, Medicare provider enrollment, certification, and reimbursement determinations, and these limitations apply whether the dispute arises from events occurring Pre-Petition, Post-Petition, or after the Effective Date.

For the sake of clarity, any and all rights granted to HHS and/or CMS under the Medicare Act shall remain in full force and effect regardless of any provision in this Plan to the contrary; and any and all disputes arising out of or related to the Medicare Act shall be subject to the jurisdiction of such court of competent jurisdiction promulgated by the Medicare Act or any other provision of the United States Code that specifies the proper jurisdiction for disputes under the Medicare Act to be heard and adjudicated; and this Plan shall neither cause HHS and/or CMS to waive, release, relinquish, hold harmless, discharge, or restrict in any way any and all rights granted to such Governmental Entities under the Medicare Act nor circumvent or limit the determination of jurisdiction for cases, controversaries, actions, or disputes arising under or related to the Medicare Act. **If any inconsistency exists between the rights of HHS and CMS set forth hereunder and/or arising out of the Medicare Act and any other provision of this Plan, the specific rights granted under this Section 8.2 and/or the Medicare Act will govern and control and nothing in this Plan shall allow otherwise.**

**8.3.    Reservation of Rights.** Nothing in this Plan shall constitute an admission by the Debtor that a contract, agreement, transaction, occurrence, or any other requirement of payment or performance, whether in writing or not, is in fact an Executory Contract or Unexpired Lease, or that the Debtor has any liability thereunder.

**8.4.    Post-Petition Agreements Unaffected by Plan.** The Plan shall not alter, amend, or supersede any agreements, contracts leases the Debtor executed Post-Petition and otherwise valid, effective, and enforceable against the Debtor as of the Confirmation Date; and, to the extent necessary, the Reorganized Debtor shall be substituted for the Debtor and have all right, title, and interest of the Debtor as if the Reorganized Debtor was the original contracting party thereunder.

## IX.    MEANS FOR IMPLEMENTATION OF PLAN

**9.1.    Sources of Funding Plan Payments.** The Debtor shall fund the Plan Payments by and

through Cash maintained within the Operating Account as of the Effective Date and Disposable Income generated from continuing operations in the ordinary course from the Effective Date up to and through the 3rd Anniversary.

**9.2.    Warranty of Plan Payments Subject to Consensual Confirmation.** Should Consummation follow a Consensual Confirmation, the Debtor shall warrant Distributions to Unsecured Claimants by prioritizing the deposits into the Disbursement Account and Distributions thereof to Holders of Allowed Claims over the salary payable to Mr. Davis for the fourth (4th) weekly pay period of each month, as mutually agreed upon by and between the Debtor and Mr. Davis.[11] Any and all Holder(s) of Allowed Unsecured Claim(s) shall have the right to inspect – upon request made in writing to the Debtor and its counsel during normal business hours, and subject to execution of an appropriate confidentiality agreement – a Summary of Cash Flows and Profit and Loss statement analogous to the financial statements attached hereto as Exhibit 4 for any period, in no less than monthly increments, during the Plan Term.

**9.3.    Liquidation of Assets When Necessary.** Notwithstanding any provision of this Plan, the Code, or Federal Rules to the contrary, the Debtor shall hold, retain, and reserve the sole and exclusive right and authority to liquidate and convert to Cash any and all unencumbered Assets as reasonable business judgment dictates when considering the costs of sale for liquidating such Assets; and Distribute the proceeds thereof in accordance with the provisions of this Plan; or to abandon and/or surrender any Assets deemed, in the exercise of reasonable business judgment, burdensome or of inconsequential value and no benefit to the Debtor.

**9.4.    Effectuating Post-Confirmation Order Documents and Transactions.** As of the Effective Date, the Debtor shall be authorized to execute, deliver, file, or record all contracts, instruments, releases, and any other documents or agreements; and take all actions necessary or appropriate to effect and further evidence the terms of the Plan without the need to seek approval from the Court, notwithstanding any such any provisions of the Code or the Federal Rules to the contrary; and each Claimant, Person, or Entity receiving any Distribution or other benefit under the Plan hereby agrees to execute such documents and take or not take any other actions as may be necessary, reasonable, or appropriate to effectuate the Plan.

**9.5.    Distributions.** Plan Payments to Holders of Allowed Claims shall proceed, as follows:

**9.5.1.    Disbursing Agent.** Upon Substantial Consummation of the Plan, the Debtor or the Trustee shall operate as the Disbursing Agent hereunder. Following a Consensual Confirmation, the Debtor shall hold no right or basis to pay itself any fees for services rendered or costs incurred arising from or related to Distribution of Plan Payments as Disbursing Agent.

**9.5.2.    Manner and Timing.** The Disbursing Agent shall hold the sole and exclusive discretion as to the exact manner used to Distribute Plan Payments, and the right to substitute one mechanism for another between Plan Payments without seeking authorization or approval from any Claimant, interested party, or approval Court. Notwithstanding the Disbursing Agent tendering Plan Payments by electronic means, Claimants shall receive Distributions at the addresses set forth in either: (1) Proofs of Claim; (2) the Schedules for any Claimant that did not file a Proof of Claim; (c) written notice of address change filed within the Case and/or submitted to the Debtor after the filing of either the Schedules or relevant Proof of Claim; OR (d) written notice of address change

---

[11]   *See* <u>Exh. 6</u>, p.2.

submitted to the Disbursing Agent at least 30-days prior to any future Distribution.

Plan Payments shall be Distributed to: (1) Holders of Allowed Secured Claims on or before the fifteenth (15th) day of each month following the Effective Date until the Allowed Claim is satisfied in full; (2) Holders of Allowed Unsecured Claims on or before the thirtieth (30th) day following each Anniversary; and (3) Holders of Disputed Claims, to the extent a Claim is not Allowed as of the Effective Date, within 30-days following the date such Claim becomes Allowed. If the date of any Distribution arises on a date other than a Business Day, the Disbursing Agent shall Distribute the Plan Payments or perform any act under this Plan on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

      **9.5.3.** __Delay of Distributions on Disputed Claims.__ The Debtor shall deposit into the Disbursement Account all Plan Payments allocated for Distribution to the Holder a Disputed Claim, and the Disbursing Agent shall maintain, preserve, and account for such Cash as Plan Payments. However, the Disbursing Agent shall make no Distribution on account of a Disputed Claim unless and until such Claim is Allowed, in whole or in part, pursuant to a Final Order settling, resolving, or adjudicating an objection to the Claim and/or Causes of Action against the Claimant; and no interest shall be paid on Disputed Claims that later become Allowed Claims unless expressly provided in the Plan or allowed by a Final Order. Following entry of a Final Order, the Disbursing Agent shall Distribute (1) the Plan Payment(s) preserved within the Disbursement Account for the Holder of a Disputed Claim on or before the earlier of (a) the deadline set forth under the Final Order rendering the Claim Allowed, or (b) if no deadline is set forth thereunder, on or before the next date for Distributions to the particular Class in which the Disputed Claim is classified following the Final Order; and (2) the balance of any Cash held in reserve with respect to the particular Claim in excess of the Distributions due on account of the resulting Allowed Claim to the Debtor for the benefit of the Estate.

      **9.5.4.** __Interest and Other Amounts Regarding Claims.__ Except as expressly provided in this Plan, the Confirmation Order, or any Final Order to the contrary; Claimants shall recover neither Distributions in excess of the Allowed Claim nor Post-Petition interest, penalties, fees, or late charges accruing or chargeable on any Claim.

**9.6.** __Post-Effective Date Governance.__ The Debtor shall continue to compensate Mr. Davis for managerial duties and performance of Chiropractic Services by and through a gross weekly salary of $3,500.00, together with reimbursement of all reasonable expenses necessary for the continuation, preservation, and/or operation in the ordinary course of the business. Furthermore, Mr. Davis shall continue to govern and control the Debtor as President and sole Interest Holder on and after the Effective Date. Mr. Davis shall receive no compensation for performing the duties of managing member,[12] which shall include, without limitation, all rights, power, and authority to carry out, consummate, effectuate, and implement all provisions of the Plan, without the need for further or future approval of the Court, so long as no Event of Default gives rise to removal of the Debtor and/or reappointing the Trustee to operate the business for the remainder of the Plan Term.

**9.7.** __Post-Effective Date Employment of Professionals.__ The Debtor may retain any Professionals necessary to assist fulfilling or exercising any rights and powers afforded to the Debtor under this Plan _other than_ the duties and responsibilities of the Disbursing Agent; and the

---

[12]   As Mr. Davis controlled a 100% ownership interest in the Debtor as of the Petition Date, he is an Insider of the Debtor. _See_ 11 U.S.C. § 101(31)(B).

Professionals employed by the Debtor after the Effective Date need not seek for the Court to approve employment or authorize payment pursuant to 11 U.S.C. §§ 327 through 331. The Disbursing Agent, if not the Debtor, shall be the sole and exclusive Person or Entity responsible for paying for all fees for services rendered and actual costs incurred by retained Professionals, insomuch as authorized by a Final Order of the Court, by and through Disposable Income deposited into the Distribution Account attributable to "Disbursing Agent Expense (Cramdown Confirmation)" line item of the Disposable Income Projections.

## X.    EFFECT OF CONFIRMATION

Confirmation of this Plan shall establish and effect the rights and responsibilities of the Debtor, Trustee, Claimants, and interested parties, as follows:

**10.1.    Binding Effect.** On and following the Confirmation Date, the rights, duties, benefits, and obligations granted, bestowed, or imposed under the terms and provisions of the Plan shall be effective, enforceable, and binding upon any Person or Entity named, referenced, or referred to under this Plan; and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiary, or guardian, if any, of such Persons and Entities.

**10.2.    Continuing Viability of Orders and Agreements.** Except to the extent expressly modified by the Plan, all Final Orders entered from the Petition Date up to and through the Confirmation Date shall remain in full force and effect up to and through entry of the Final Decree.

**10.3    Vesting of Assets.** As of and following the Effective Date: (1) all Assets of the Estate either Scheduled or disclosed under Section 3.3 *supra*[13] shall revest in the Debtor free and clear of all Claims, liabilities, obligations, charges, Liens, Security Interests, and all other interests of every kind and nature, except as otherwise explicitly provided in this Plan or the Confirmation Order; and (2) notwithstanding any restrictions expressly imposed by this Plan or the Confirmation Order, the Debtor may operate the business and use, acquire, and/or dispose of property free of any restrictions promulgated under the Code or Federal Rules.

**10.4.    Waiver and Estoppel.** Claimants shall be deemed to have waived any right to assert any argument, including the right to argue that their Claim should be Allowed in a certain amount, certain priority, or Secured against Collateral by virtue of an agreement made with the Debtor, an agent for the Debtor, or any other Person or Entity either Pre- or Post-Petition if such agreement was not disclosed within or attached to the Plan, Schedules, a Proof of Claim, or any other pleadings filed within the Case or an ancillary proceeding thereof before the Confirmation Date.

**10.5.    Preservation and Prosecution of Claim Objections and Causes of Action.** Except as expressly provided in this Plan or the Confirmation Order to the contrary, the Debtor shall hold, retain, reserve, and preserve free of restriction or impairment, either on behalf of the Debtor or as the representative of the Estate pursuant to 11 U.S.C. § 1123(b)(3)(B), sole and exclusive right power, authority, discretion to determine in its business judgment, and right to: (1) commence, assert, pursue, prosecute, adjudicate, defend, demand, and/or otherwise deal with all rights, claims for relief, objections, and/or defenses with respect to any Proof of Claim, Causes of Action, contested matters or adversary proceedings pending on the Confirmation Date, and claims and

---

[13]    For the sake of clarity, such Assets include, without limitation, Causes of Action identified under Section 3.3.2 *supra* and excludes Restricted Devices surrendered in accordance with a Final Order or under this Plan.

Causes of Action either not specifically identified, for which the Debtor may presently unaware, may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or subject to facts and circumstances which may change or be different from those which the Debtor now believes to exist; (2) file any Proof of Claim in accordance with FED.R.BANKR.P. 3004; (3) settle and compromise any Disputed Claim(s) and/or Cause(s) of Action pursuant to terms and conditions that the Debtor shall determine in its business judgment to propose or accept of such settlements and compromises; and (4) with respect to compromises of Disputed Claims, enter into a settlement either: (a) without notice to Claimants or approval from the Court if settlement or compromise provides for an Allowed Claim in an amount equal to or less than $25,000.00; or (b) subject to compliance with FED.R.BANKR.P. 9019 and entry of a Final Order if settlement or compromise provides for an Allowed Claim in an amount greater than $25,000.00.   For the sake of clarity, the above-enumerated rights are neither exhaustive nor exclusive of one another and provide that all Causes of Action and Claim objections shall survive confirmation and shall not be barred, limited by, or subject to any preclusion doctrine including but not limited to, the doctrines of laches, waiver, claim or issue preclusion, or estoppel, whether judicial, equitable, or otherwise.

**10.6.**   **Services of Disbursing Agent to Include Post-Consummation Reporting.** Upon Consummation of the Plan, the services of the Disbursing Agent shall be imposed upon either the Debtor following a Consensual Confirmation or, following a Cramdown Confirmation, the Trustee shall continue to render Professional services for the Estate up to and through the earlier of the close, dismissal, or conversion of the Case to another chapter under the Code; and the applicable Disbursing Agent shall be required to: (1) if the Debtor, provide financial statements summarizing post-Consummation cash flows and Distributions of Plan Payments to any Person or Entity, upon request, which shall replace the duties and obligations imposed under FED.R.BANKR.P. 2015(a)(6) on and after the Effective Date; or (2) the Trustee shall file Post-Confirmation Reports in substantial compliance with UST Form 11-PCR within the Case if Consummation follows a Cramdown Confirmation.

**10.7.**   **Injunction.** Except as otherwise expressly provided in this Plan, the Confirmation Order, or any Final Order; (1) the occurrence of the Effective Date following Consensual Confirmation shall preclude and permanently enjoin all Persons and Entities who have held, currently hold, or may hold claims, rights, causes of action, liabilities, or any other interests based on any act or omission, transaction, or other activity of any kind or nature related to, concerning, or against the Debtor, Estate, or the Bankruptcy Case that occurred any time prior to the Effective Date, regardless of such Person or Entity holding an Allowed, Disallowed, or no Claim or Interest against the Debtor or the Estate, actively, passively, or not participating in the Case, filing or failing to file a Proof of Claim, or voting to accept or reject the Plan, provided that such Person or Entity received constructive notice of the Case at any time prior to the Confirmation Date, together with their successors, assigns, agents, or representatives of such Persons and Entities from (a) commencing or continuing any action or proceeding, in any manner and/or place; (b) creating, perfecting, or enforcing any Lien or Security Interest (c) enforcing, attaching, collecting, or recovering any judgment, award, decree, or order against the Debtor, Estate, Assets of the Estate, and/or Assets revested in the Debtor on the Effective Date, and (d) post-Confirmation Date Gross Receipts Distributed under the Plan as contemplated under the Disposable Income Projections; provided that nothing in this Plan shall: (i) extinguish, prohibit, or otherwise limit the right of any Holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan; or (ii) enjoin or otherwise preclude any

Person or Entity from enforcing the terms of the Plan and the Confirmation Order; or (2) following a Cramdown Confirmation, all injunctions or stays arising under the Code and non-bankruptcy law including, but not limited to, 11 U.S.C. §§ 105 and 362 shall remain in full force and effect up to and through the Discharge Date, and the injunction to follow a Consensual Confirmation – more-fully described in clause (1) of this Section – shall become effective on the Discharge Date.

**10.8.** **Exculpation.** The Debtor, Trustee, and their respective attorneys, accountants, and agents shall not incur any liability to any Person or Entity for any act or omission in connection with or arising out of their administration of the Case, Estate, or this Plan, except for gross negligence or willful misconduct, up to confirmation of the Plan.

**10.9.** **Setoffs.** Except as otherwise expressly provided for in this Plan, under the Confirmation Order, or pursuant to any other Final Order; the rights of the Debtor and/or the Estate to setoff or recoup from any Claim on which Distributions are to be made or from any Person or Entity for which a Cause of Action is asserted shall remain in full force and effect to the fullest extent permitted under the Code or applicable non-bankruptcy law through the entry of a Final Decree.

**10.10.** **Release of Liens Upon Satisfaction of Corresponding Claim.** Except as otherwise provided under this Plan, the Confirmation Order, or in any contract, instrument, release or other agreement or document created in accordance with, pursuant to or as contemplated under this Plan; each Lien, Security Interest, Financing Statement, or other interest Secured against any Assets of the Bankruptcy Estate shall be fully released, settled and discharged and all rights, title, and interest of each Holder of an Allowed Secured Claim shall revert to the Debtor upon, but not unless or until, the Debtor satisfies in full the Allowed Claim corresponding to the respective Lien, Security Interest, Financing Statement, or other interest held by a Secured Claimant, in accordance with the Treatment provided under Article VI *supra*.

**10.11.** **Discharge.** Following confirmation of the Plan, the occurrence of the Discharge Date shall be governed by 11 U.S.C. § 1192. On the Discharge Date, the Debtor shall be discharged and released from any Claims, debts, liabilities, or obligations that arose before the Confirmation Date to the fullest extent allowed under 11 U.S.C. § 1141(d); provided that the Debtor will not be discharged of any Claim, debt, liability, or obligation imposed by this Plan.

**10.12.** **Post-Consummation Modification of Plan.** The Debtor may modify the Plan after the Effective Date to the fullest extent permitted under 11 U.S.C. § 1193.

**10.13.** **Case Closure.** Should Consummation follow Consensual Confirmation, and in no other circumstances, the Debtor may move the Court to administratively close the Case pursuant to Fed.R.Bankr.P. 3022 upon the entry of a Final Order in any contested matters or adversary proceedings pending on the Confirmation Date and expiration of all deadlines for filing Proofs of Claim, applications for Administrative Expenses, and objections thereto expressly provided under this Plan. Irrespective of the Court granting administrative closure or the Case remains open for the entire Plan Term following a Cramdown Confirmation, the Disbursing Agent shall file a report on Distribution of all Plan Payments and full administration of the Estate in substantial conformity with L.B.F. 3022-1.1 and move for the entry of a Final Decree upon determining that all Claims have been Allowed or Disallowed, the Assets and Estate fully administered, and all Plan Payments Distributed in accordance with the Plan; and no later than the 180-days following the 3rd Anniversary. Upon entry of the Final Decree: (1) the Debtor, Disbursing Agent, and Professionals of such respective parties employed during the Plan Term shall be deemed discharged and have

no further duties or obligations to any Person or Entity, to the extent not previously discharged by the Court; and (2) notwithstanding any obligation imposed under this Plan to the contrary, the Case will be deemed closed and no fees will thereafter accrue or be payable to any Person or Entity.

**10.14. Tax Consequences.** This Plan does not address any aspect of federal, state, local, or foreign tax laws that may be applicable to taxpayers. Although the Debtor anticipates that Distributions from the Estate to Holders of Allowed Claims will have not have any tax impact since the Debtor is merely repaying on account of a debt due and owing to such Claimants, the tax consequences to Holders of Claims and Interests may vary based on the individual circumstances of each Holder. However, the Debtor provides this Section 10.14 for informational purposes as a summary of certain tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. Therefore, the Debtor shall never provide tax advice to Claimants or Interest Holders; and urges Claimants and Interest Holders treated by the Plan to consult with their own tax advisor regarding the federal, state, local, or foreign tax consequences of the Plan.

**10.14.1. Internal Revenue Service Circular 230 Disclaimer. The discussion of tax consequences in this communication is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer (i) for the purpose of avoiding tax penalties that may be imposed on the recipient or any other taxpayer, or (ii) in promoting, marketing, or recommending to another party any transaction addressed herein.**

## XI.   RIGHTS AND REMEDIES UPON DEFAULT

The Plan allocates such rights to any Person or Entity aggrieved by a Default Event ("***Aggrieved Party***") and the Person or Entity causing the Default Event ("***Defaulting Party***"), as follows:

**11.1. Notice and Right to Cure.** Except for the rights and responsibilities explicitly afforded to Governmental Units under Section 11.3 *infra*, an Aggrieved Party shall serve upon a Defaulting Party a Default Notice setting forth, with specificity, the nature of the alleged Default Event and steps required by the Defaulting Party to cure such Default Event; and the Defaulting Party shall cure the Default Event in full within 30-days following actual receipt of the Default Notice.

**11.2. Remedies for Failure to Cure Default.** If the Default Event is not timely cured on or before the 30th day following the Defaulting Party having actually received the Default Event, the Aggrieved Party may file and serve, upon all Persons or Entities entitled to notice pursuant to Section 13.4 *infra*, a motion to the Court to: (1) compel compliance with the applicable provisions of the Plan or (2) such specific remedies depending on the classification of the Aggrieved Party under this Plan, as follows:

**11.2.1. Holders of Secured Claims** may move the Court for immediate relief from the automatic stay to seize and sell, in accordance with state law and custom, the Asset(s) secured against the Allowed Secured Claim as consideration for full satisfaction, settlement, release, and discharge of the Allowed Claim, and the Debtor shall be entitled to collect all Cash proceeds exceeding the balance of the Allowed Secured Claim for the benefit of the Estate.

**11.2.2. Holders of Unsecured Claims** may move the Court to (a) reappoint the Trustee to seize and liquidate unencumbered Asset(s) (1) not utilized in the ordinary course of operations at least ninety-two (92) days of the year, and (2) maintaining a value equal to or less than the sum the Debtor failed to deposit into the Disbursement Account.

**11.2.3. <u>Persons Privy to Assumed Contracts</u>** may, for failure of payment and/or performance, move the Court to unilaterally reject the Assumed Contract, grant immediate relief from the automatic stay to seize any Asset subject thereto; and set a deadline for the Aggrieved Party to file a Rejection Claim within 30-days following rejection, subject to the Debtor reserving the right to object to the Rejection Claim within 30-days following the filing thereof.

**11.2.4. <u>Debtor</u>** may move the Court to designate a Person to appear, sign, and/or accept the documents required under the Plan on behalf of the Defaulting Party or make such other order as may be equitable that does not materially alter the terms of the Plan; and the Court shall award the Debtor pursuant to 11 U.S.C. §§ 105 and 362, upon finding the Defaulting Party in contempt of the Confirmation Order, reasonable attorneys' fees and actual costs incurred to enforce the Confirmation Order and remedy the Default Event, compensatory damages, pre-judgment interest pursuant to COLO.REV.STAT. § 5-12-102, and post-judgment interest pursuant to 26 U.S.C. § 1961.

**11.3. <u>Rights of Governmental Units.</u>** Should the Debtor fail to timely tender payments to any Governmental Unit on account of a Secured or Priority Claim, to the extent Allowed, or an Administrative Expense arising from any taxes due and payable Post-Petition, any other taxes provided for in this Plan, or any other post-confirmation reporting and payment obligations including, but not limited to, failure to file any Post-Petition returns, disclosures, records, and/or reports with any and/or all Governmental Units, to the extent applicable under non-bankruptcy law; the Governmental Unit asserting such Default Event shall afford written notice to the Debtor and Counsel for the Debtor that provides for the right to cure any and all default(s) within fourteen 14 days of the date thereof; and if the Default Event is not cured within 14-days from the date of notice in writing the Debtor and Counsel for the Debtor, regardless of any other provision in this Plan to the contrary, the applicable Claimant shall be authorized to proceed in the normal course of operations for such agency in obtaining delinquent returns and/or collecting liabilities in accordance with applicable non-bankruptcy law including, but not limited to, making the entire Pre-Petition Claim regardless of whether or not Allowed immediately due and owing and enforcing such obligation(s) as if the Debtor had never filed the Case and no automatic stay or other injunction is in force and/or effect; and nothing in this Plan shall allow otherwise.

**11.4. <u>Non-Enumerated Mutually Agreeable Remedies.</u>** In addition to the above-enumerated rights and remedies afforded to Claimants, Interest Holders, and the Debtor, the Aggrieved Party and Defaulting Party may resolve any Default Event by and through mutually agreeable terms and conditions without any further notice to Persons or Entities entitled to notice pursuant to Section 13.4 *infra*; provided that Section 11.2 represents an exhaustive list of remedies absent the Aggrieved Party and Defaulting Party memorializing their resolution of the Default Event.

## XII.      <u>RIGHTS PRECEDING AND SUBJECT TO CONSUMMATION</u>

Unless and until the Confirmation Order, in a form reasonably acceptable to the Debtor, becomes a Final Order and the Effective Date occurs, rights related to the Plan and confirmation process are hereby reserved, as follows:

**12.1. <u>Modification.</u>** The Debtor may alter, amend, or modify this Plan, as follows: (1) before entry of the Confirmation Order, pursuant to 11 U.S.C. § 1193(a), which shall supersede all previous versions of the Plan upon becoming effective and previous superseded versions of the Plan shall be deemed in the nature of a withdrawn or rejected settlement proposal having no evidentiary or substantive effect; and/or (2) after the Confirmation Date but prior to Substantial Consummation,

subject to compliance with 11 U.S.C. § 1193(b).

**12.2.   Revocation or Withdrawal.** The Debtor reserves the right to revoke or withdraw this Plan before the Effective Date and file a subsequent and/or amended Chapter 11 plan of reorganization. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur; the Plan, any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be null and void in all respects; and the Plan shall not, in any respects: (1) constitute a waiver or release by or against the Debtor, (2) prejudice in any manner the rights of the Debtor; (3) or constitute an admission, acknowledgment, offer, or undertaking.

**12.3.   Voting on the Plan.** Each Eligible Voter shall elect to accept or reject the Plan on the Ballot attached hereto and incorporated by reference herein by casting only one Ballot for each Claim in a Voting Class; and by signing and returning a Ballot, the Eligible Voter shall certify, with respect to such Claim, that no other Ballots have been cast or any other Ballots previously cast are superseded and revoked. A duly-executed Ballot that an Eligible Voter holding a Claim not subject to an objection pending as of the Voting Deadline – unless the Court otherwise deems the Claim Allowed for the purposes of voting – shall be tabulated toward acceptance or rejection of the Plan only if completed in full compliance with the instructions contained in the Ballot and delivered to the Debtor so that actually received on or before the Voting Deadline.

**12.4.   Objections to Confirmation of the Plan.** Persons and Entities shall file within the Case and serve upon the Debtor, Trustee, and UST any objections to confirmation of the Plan in accordance with the deadlines established under the Scheduling Order; and the Court shall determine at the Confirmation Hearing any issues related to the merits of the Plan identified within timely-filed objections including, but not limited to, whether to confirm the Plan at the hearing on confirmation of the Plan set to commence on April DD, 2024 at 1:00 p.m.

**12.5.   Effect on Acceptance of Preceding Plan.** A Claimant that has voted to accept the Plan shall be deemed accept the Plan as altered, amended or modified, if (1) such Person fails to timely object to the proposed alteration, amendment or modification or (2) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the Treatment of such Holder's Claim.

**12.6.   Reformation.** To the extent a particular provision, term, or condition of this Plan precludes confirmation, the Court may strike such provision and confirm the Plan as modified, with such term, condition, or provision omitted, excluded, or otherwise modified any time prior to the Consummation Date; subject to the consent of the Debtor, Trustee, and UST; provided that the Plan, as altered, amended or modified, satisfies all requirements under the Code and the Court approves such modifications after such notice, and under such circumstances, as the Court determines to be fair and equitable.

**12.7.   Nonoccurrence of Effective Date.** The Plan shall have no force or effect unless the Court enters the Confirmation Order; and neither any statement or provision in the Plan nor any action taken or not taken pursuant to the Plan or Confirmation Order before the Effective Date shall be deemed an admission or waiver of any rights of the Debtor or the Estate. In the event the Effective Date does not occur for any reason including, but not limited to, the Debtor electing to withdraw this Plan, the Court shall retain jurisdiction to adjudicate any "core" matters including, but not limited to, confirming any amended or subsequent plan of reorganization filed in the future and

extending any deadlines arising under the Code, Federal Rules, or this Plan.

**12.8.** **Reservation of Rights.** The Debtor hereby reserves the right to: (1) seek Cramdown Confirmation of the Plan if any Impaired Class votes to reject the Plan pursuant to 11 U.S.C. §§ 1191(b) and (c), without any further notice Claimants or interested Persons; (2) seek Consensual Confirmation of an amended plan of reorganization, (3) and/or seek to withdraw this Plan and file a subsequent plan of reorganization.

## XIII.    MISCELLANEOUS PROVISIONS

**13.1.** **Entire Agreement.** Except as otherwise indicated, the Plan and the Confirmation Order, together with any exhibits, addendums, and/or documents made part of the Plan as attachments hereto and incorporated by reference as if set forth in full herein thereto, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**13.2.** **Severability.** If determining that any provision in this Plan is invalid, void, or unenforceable, the Court shall have the power to alter and interpret such provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose thereof, which shall then be applicable to the Plan as altered or interpreted; and the remaining provisions of the Plan shall remain valid, unaffected, and in full force. Notwithstanding the Confirmation Order constituting a judicial interpretation that the Plan is valid and enforceable, any court of competent jurisdiction finding a provision of this Plan to be invalid, void, or unenforceable will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**13.3.** **Captions.** The captions and headings in this Plan are for convenience of reference only, are not intended to be a part of, or to affect, the interpretation of any Article or Section of this Plan; and shall neither limit nor affect, in any manner, the meaning or interpretation of this Plan.

**13.4.** **Post-Effective Date Service.** Following the Effective Date, the Debtor shall limit service of pleadings and notices to Persons and Entities adversely affected by any relief requested and those that have filed a request to receive notice within the Case pursuant to FED.R.BANKR.P 2002 on or after the Petition Date through entry of the Final Decree; and all pleadings, notices, requests, demands, and any other documents or correspondences that the Plan requires to be delivered to the Debtor shall be deemed duly served upon actual receipt by the Debtor through First-Class U.S. Mail postage pre-paid and to Counsel by electronic means, at such address as follows:

| | |
|---|---|
| The Debtor: | Center for Alternative Medicine, PLLC |
| | 2505 Kachina Drive |
| | Pueblo, Colorado 81008 |

– AND –

| | |
|---|---|
| Counsel for Debtor: | SHEADE LAW OFFICE, LLC |
| | Attn: Joshua B. Sheade, Esq. |
| | 4126 Shoshone Street |
| | Denver, Colorado 80211 |
| | E-mail: joshua@sheadelaw.com |

**13.5.** **Computation of Time.** Any deadline to arise on a certain date or within a certain period prescribed or allowed under the Plan shall be subject to and governed by FED.R.BANKR.P. 9006(a).

**13.6.    Reference to Monetary Figures.** Monetary figures refer to currency of the United States of America as expressed in dollar amounts, unless otherwise expressly provided.

**13.7.    Governing Law.** Except to the extent the Code, Federal Rules, or other non-bankruptcy law applies, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, construed, and enforced in accordance with, the laws of the State of Colorado, without giving effect to conflicts of law principles.

**13.8.    Retention of Jurisdiction.** Following the Effective Date, the Court shall retain jurisdiction over the Case and all matters arising out of, or related to, the Case and/or the Plan including, but not limited to, as follows: (1) hear and adjudicate Claim objections, assumptions of Executory Contracts, approval of compromises or settlements under FED.R.BANKR.P. 9019, post-confirmation amendments or modifications to the extent permitted under 11 U.S.C. § 1193, and any other disputes arising under the Plan; (2) enter and enforce any orders as necessary or appropriate to correct any defect, cure any omission, reconcile any inconsistency, or as may otherwise be necessary to carry out the provisions, purposes, and intents of the Plan and/or Confirmation Order; (3) enforce Final Orders; (4) entry of the Final Decree; or (5) adjudicate Causes of Action, contested matters and/or adversary proceedings deemed "core proceedings" under 28 U.S.C. §§ 157(b)(2) and 1334 and/or "non-core proceedings" for which the parties thereto have consented to the authority of the Court to enter Final Orders and judgments.

**13.9.    Controlling Document.** Except as expressly provided in this Plan, the Plan shall govern and control to the extent any provision of the Plan conflicts or in any way is inconsistent with any pleading, document, or order referenced in the Plan; or any exhibit, supplement, or amendment thereto; provided, however, with respect to any conflict or inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

**XIV.       CONFIRMATION REQUEST**

WHEREFORE, Center for Alternative Medicine, PLLC respectfully requests that the United States Court for the District of Colorado (1) enters an order confirming this Plan either (a) under 11 U.S.C. §1191(a) following Eligible Voters voting to accept the Plan; or (b) pursuant to 11 U.S.C. § 1191(b), upon finding that the Plan does not unfairly discriminate and is fair and equitable with respect to each Impaired Class that has voted to reject this Plan; and (2) grant such other and further relief as the Court deems appropriate and just.

DATED this 20th of February, 2024.

Respectfully submitted,

By: Theodore W. Davis, President for
Center for Alternative Medicine, PLLC
*Chapter 11 Debtor-in-Possession*

<u>**APPROVED AS TO FORM**</u>:
SHEADE LAW OFFICE, LLC

Joshua B. Sheade, Atty. Reg. No. 46993
4126 Shoshone Street
Denver, Colorado 80211
Tel.: (720) 389-9291
E-mail: joshua@sheadelaw.com
*Counsel for Center for Alternative Medicine, PLLC*

44